This is an appeal from a judgment of the Huron County Court of Common Pleas, Juvenile Division, which awarded appellee, Raymond D., custody of the parties' child. For the reason that follow, this court affirms, in part, and reverses, in part, the judgment of the trial court.
On January 20, 1998, appellant, Linda Kay F., filed a complaint in custody, requesting to be the residential parent and legal custodian of the parties' daughter. On February 25, 1998, following a hearing, the trial court appointed Mary Ann Lamb as guardian ad litem for the child.
The matter came for trial before the trial court on April 22, 1998. At trial, appellant, appellee, Terry Weaver, Susan Kircher, Dorenda Welsh, and Patricia Merritt, testified. The report of the guardian was admitted, for consideration by the court in determining the case, without objection from appellant's counsel.
Generally, the evidence demonstrated that appellant and appellee had been living together, unmarried, until 1995 when they split up. They had one daughter between them who was six years old at the time of trial. The child began living with appellee when he refused to return her after he and his sister took the child one weekend in 1995 to babysit. Appellee alleged that appellant was not caring properly for the child. In the fall of 1996, appellant sought assistance from the Child Support Enforcement Agency ("CSEA"). As a result of contacting CSEA, the agency found appellee to be the residential parent and ordered that appellant pay child support.
At trial, appellant testified that she split with appellee because he had been "beating on me." At the time of trial, appellant stated that she lived only with her youngest daughter. She also stated that she lost her job in the fall of 1997 because appellee was harassing her on the phone at work and "the manager told [her] [she] wasn't allowed to go back to work until [she] got the whole mess straightened out." Appellant testified that if she got custody of her daughter she would be able to support her because she could then return to her job at McDonald's.
With respect to visitation and custody, appellant testified that she contacted CSEA for help in getting her daughter back. Appellant also testified that the CSEA order was the only order between the parties and that they never went to court regarding custody or visitation. Appellant also testified that she was supposed to get the child every weekend; however, appellee sometime kept her from seeing the child.
Appellant asserted that she should receive custody because "I will give her the counseling that she needs." Appellant went on to state that the child had been "begging for counseling since she was four years old." When asked what problem the child was experiencing that she would help her get through, appellant responded that the child was scared, crying at night, playing with naked dollies, touching appellant in the wrong areas, feeling that nobody loved her, and wishing she was dead. Appellant also stated that the child expressed that appellee would spank her if she did not say what appellee would tell her to say. Appellant also asserted that it would be in her daughter's best interest to live with her because the child needed her mother, had been crying for her, and that the child missed and wanted appellant.
On cross-examination, appellant was questioned concerning her alleged boyfriend, Richard Storch, who was thought to have been convicted of child molestation. Appellant testified that there was some mistaken identity issue between Storch and his brother. Appellant also denied that he was her boyfriend, and stated that he was just a friend that took her places she needed to go. With respect to the alleged criminal conviction, the following exchange took place:
 "Q. Is he the same Richard Storch that was convicted in Erie County of child molestation?
 "A. Okay. I'll explain something to you right now. His brother, okay, looks just like him. Okay, he's in prison right now because he stole his identity for twelve years. So there is a different thing going on here. You guys don't even understand the whole background on what's going on. I don't even know why you're bringing that up.
 "Q. Does this Ray (sic) Storch have contact with [the child] from time to time?
 "A. The only time he comes over is to help me out with things that I need help with. Go to the grocery store. Take me to the laundry mat. He drives me where I need to go. Sometimes he's over for dinner. He has never abused my kids. He's really good with my kids.
When asked again whether Storch was the same man convicted in Erie County, appellant responded, "No it was not. They got, they have the wrong person. He has a brother that stole his identity. He is working on that right now."
Appellee then testified that he lived in a two bedroom apartment with his daughter, his girlfriend, Dorenda Welsh, and their fifteen month old son. Appellee stated he was on disability and received Social Security benefits for Tourette's syndrome.
Appellee also testified that he and Welsh had taken care of the child's meals, laundry, the nurturing aspects of taking care of the child, and that he was her primary care giver since 1995. Appellee stated that he wanted to be the legal custodian of his daughter, "Because I can take well care of her. She's happy where she's at. She's well taken care of. Anything that she needs, she's got. She's happy and content."
With respect to visitation and custody, appellee testified that it was actually his sister who refused to return the child to appellant, after picking her up to babysit, because of "the unstable environment, she was at risk." Appellee also testified that appellant did not contact him for six months after he failed to return the child. Appellee asserted that he never denied appellant visitation, except to the extent that he refused to allow appellant to have the child in her home when Richard Storch was likely to be present:
 "When I told her she wasn't allowed to see her under her roof because of Rick Storch being there, being a convicted child molester, I was not allowing it."
When asked if the child ever expressed any indication that she felt unloved, appellee responded:
 "She gets tired of having to go to her mom's house all the time and cleaning up her house. She sits there and changes her sister's diapers, feeds her bottles when her mom's sleeping. She calls me up wanting to come home at times and either Lindsey or her mom pulls the phone cord out of the wall saying she doesn't want her talking to her daddy."
Terry Weaver, appellee's friend, and former friend of appellant, testified that appellee had a good relationship with his daughter, that the child liked her home with appellee, that appellee was a diligent parent and that appellee and the child loved one another.
Susan Kircher, friend of both appellee and appellant, and who visited at both parties' homes, testified that she witnessed appellant punch the child "Right in the middle of the back." Kircher also testified that she heard, a couple of times, appellant call the child a "bitch" when appellant was upset with her. Kircher further testified that appellant gave the child a cigarette. With respect to appellee's relationship with the child, Kircher testified that appellee was "just real nice to her," that he did not hit her, but would just send her to her room.
Dorenda Welsh testified that appellee had a very good relationship with his daughter, that the child loved him, and he her, and that he did "normal father things." Welsh also testified that she had been in appellant's home fifty to a hundred times over a two and one-half year period to deliver the child for visitation. Welsh further testified that, when appellant was upset, she heard appellant call the child a "bitch" and say, " 'F' you" to her.
Patricia Merritt, appellee's sister, testified that in 1995 she went to pick the child up because appellant had called to see if she would watch her. Merritt stated that the child answered the door, appellant was sound asleep in bed, at 11:30 a.m., the child's hair was matted down because it had lotion in it, and that there were steak knives on the coffee table. With respect to appellee's relationship with his daughter, Merritt testified that appellee had a good relationship with her, that he played and entertained her, and was there full-time with her.
Also part of the record was the report of the guardianad litem who interviewed the child, appellant, appellee, appellant's case manager at Counseling Centre, the child's teacher, and appellee's counselor at Catholic Charities. The guardian's report stated that appellant was homeless for a period of time after the parties split up. The guardian also stated that in August 1996, the parties agreed to have the child continue living with appellee and appellant agreed to visit the child every weekend and pay $50 a month in support. With respect to finances, appellant told the guardian that the child received $84 in Social Security benefits each month, which had continually gone to appellant.
With respect to appellant, the guardian reported that appellant lived with her two year old daughter in a two bedroom apartment, was not employed, received Social Security benefits for developmental disabilities, received case management services through the Counseling Centre, and had stable mental health. As to appellant's "boyfriend," the guardian reported:
 "I learned through father, and mother's case manager confirms, that mother's current boyfriend is Richard Storch who may have been the man involved in the 'daddy bear' sexual abuse case in Erie County 5 or 6 years ago. Mother refuses to tell me who her boyfriend is saying that he does not want to get involved. This man does have contact with [the child] and [her] sister although I was not able to determine how much. [The child] told me in a private conversation that she is very good around 'Rick' because if she's not 'he'll bong, bong on my butt', which was a reference to spanking."
With respect to appellee, the guardian reported that he lived with his girlfriend, Dorenda Welsh, their infant son, and the child; that appellee was on medical disability; and that Welsh worked forty hours per week. Appellee's criminal record included disorderly conduct, drinking and driving, and failure to file city income taxes, all prior to 1996. Appellee enrolled himself and the child in the Catholic Services for counseling, but only went once and canceled twice, prior to trial. With respect to visitation, however, the guardian reported, "Father believes that he is in control of [the child's] visits with her mother and he withholds visits when he has a point to make with mother."
With respect to the child, the guardian reported the following:
 "In my conversations with [the child] I find her to be quite fond of her father and clear in her desire to remain in his home. Much of what she says about her mother sounds like it came from father because she told me about incidents that happened to her that she, herself, doesn't remember and can't put a time frame to. She complained that mother spends more money on her baby sister than she does on her which is an issue that I know has been frequently discussed between the parents. At first [the child] said she would not like to visit her mother but she corrected that as soon as she perceived what she had just said."
The guardian also interviewed the child's teacher, and reported the following:
 "[The child's] teacher * * * reports that she is usually clean and ready with homework completed when she comes to school. [The child] has social problems with the other children and often bosses them around. She seldom mentions her mother and the teacher has never had contact with mother. Father has contacted the teacher several times to get clarification on homework assignments. [The teacher] also reports that father reinforces her corrections of [the child's] behavior at home.
Although there had been a history of domestic strife between the parties, and accusations of abuse and neglect, no abuse or neglect had ever been substantiated. Ultimately, the guardian recommended the following: the child remain in the custody of appellee; appellant should have visitation every other weekend and for two weeks in the summer; there should be a restriction of no contact with Storch, unless appellant can establish that he was not the same man convicted of molestation in Erie County; appellee and child should continue counseling; and child's surname should be changed to that of her father's.
On April 24, 1998, the trial court ordered, in pertinent part, that appellee be named residential parent and legal custodian; that it was in the child's best interest to have her surname changed from that of her mother's to her father's, on her birth certificate; that the child have no association or communication, direct or indirect, with Richard Storch; that appellant have visitation with the child as outlined in the order; that the child and appellee continue to participate in counseling; and that appellant pay child support in the amount of $51 per month.
On May 8, 1998, appellant moved the trial court to vacate its April 24, 1998 judgment and grant her a new trial on all issues. The basis of the motion for new trial was that: "No party requested the change of the child's name in writing as such this portion of the judgment is contrary to law; and Richard Storch was acquitted on one of the charges and the remaining charges were nolled." The trial court denied appellant's motion for new trial on May 19, 1998.
On May 19, 1998, the trial court also entered its findings of fact and conclusions of law, relating to the April 22, 1998 trial. The trial court made the following findings:
 "1. Defendant had had custody of the child of the parties * * * since 1995. In August 1996, a CSEA Administrative hearing was held and both parents agreed to the child living with the father in the father's home. Mother was to pay support of $50.00 a month but has not done so. In fact, mother received $84.00 a month in Social Security benefits for [the child] and kept same even though [the child] lived with her father.
 "2. Plaintiff made little or no effort to communicate with the child during the first six (6) months that defendant had custody.
 "3. Plaintiff has visited with the child on a somewhat regular basis since that time.
 "4. Plaintiff has lived in an unstable lifestyle for the last two to three years and has recently been associating with a Ray [sic] Storch who has been charged of serious sexual felonies in Erie County.
 "5. Plaintiff also receives Social Security benefits for developmental disability.
 "6. Defendant is also on SSI and lives with Dorenda Welsh and her daughter. Dorenda works 40 hours a week."
Appellant timely appealed the decision of the trial court and raised the following assignments of error:
 "I. THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT IN CHANGING THE CHILD'S SURNAME.
 "II. THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT IN GRANTING CUSTODY TO THE CHILD'S FATHER.
 "III. THE TRIAL COURT ERRED IN DENYING PLAINTIFF-APPELLANT'S MOTION FOR A NEW TRIAL.
 "IV. THE TRIAL COURT COMMITTED PLAIN ERROR IN CONSIDERING THE GUARDIAN AD LITEM'S REPORT.
 "V. THE TRIAL COURT LACKED SUBJECT MATTER JURISDICTION TO CONSIDER THE ISSUE OF CUSTODY WHERE A CHILD CUSTODY AFFIDAVIT WAS NOT FILED."
Appellant asserts in her first assignment of error that the trial court erred in sua sponte changing the child's surname. We agree. Bobo v. Jewell (1988), 38 Ohio St.3d 330, paragraph two of the syllabus, lists the factors to consider in determining whether it would be in a child's best interest to change her surname:
 "In determining the best interest of the child concerning the surname to be used when parents who have never been married contest a surname, the court should consider: the length of time that the child has used a surname, the effect of a name change on the father-child relationship and on the mother-child relationship, the identification of the child as part of a family unit, the embarrassment, discomfort or inconvenience that may result when a child bears a surname different from the custodial parent's, the preference of the child if the child is of an age and maturity to express a meaningful preference and any other factor relevant to the child's best interest. Courts should consider only those factors present in the particular circumstances of each case."
Neither party requested that the child's surname be changed; rather, it was merely a suggestion from the guardianad litem. We find that none of the factors set forth in Bobo
are present in this case. Accordingly, we find appellant's first assignment of error well-taken.
In appellant's second assignment of error, she argues, that the trial court erred to her prejudice in granting custody to appellee. Specifically, appellant argues that there was no evidence regarding certain statutory factors set forth in R.C.3109.04(F), which the trial court is to consider, such as, the child's preference, which party is more likely to facilitate visitation, and the parties' health.
Initially, we note that it is a well-established rule in Ohio that a trial court's ultimate decision as to the custody of children will not be overturned on appeal absent an abuse of discretion. Reynolds v. Goll (1996), 75 Ohio St.3d 121, 122, citing, Trickey v. Trickey (1952), 158 Ohio St. 9. "The term 'abuse of discretion' connotes more than an error of law or judgment, it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
R.C. 3109.04(F) states the factors a trial court is to consider in determining the best interest of a child, as follows:
 "(F) (1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
 "(a) The wishes of the child's parents regarding his care;
 "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 "(c) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;
 "(d) The child's adjustment to his home, school, and community;
 "(e) The mental and physical health of all persons involved in the situation;
 "(f) The parent more likely to honor and facilitate visitation and companionship rights approved by the court;
 "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25
of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 "(i) Whether the residential parent or one of the parents subject to a shared patenting decree has continuously and willfully denied the other parent his or her right to visitation in accordance with an order of the court;
 "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
We will consider each factor appellant alleges was not supported by the record. Appellant asserts that the child's preference was not included in the record. We find, however, that the guardian's report addressed the child's wishes. The guardian interviewed the child and reported that she wished to stay with her father and indicated a desire to visit with her mother:
 "In my conversations with [the child] I find her to be quite fond of her father and clear in her desire to remain in his home. * * * At first [the child] said she would not like to visit her mother but she corrected that as soon as she perceived what she had just said."
Hence, even though the child was not interviewed by the court, and the court made no finding with respect to the child's wishes, we find that the child's wishes regarding her care were, in fact, expressed in the record.
Appellant also asserts that there was no evidence concerning which party would be more likely to facilitate visitation. R.C.3109.04(F) (1) (f). Appellant focuses on the fact that appellee got the child when asked to babysit and then never returned her thereafter. Even so, those circumstances do not go to visitation.
With respect to visitation, appellant testified that she only occasionally got visitation with her daughter because appellee sometimes kept her from seeing the child, even though she was supposed to get her every weekend. To the contrary, Welsh testified that she had been over to appellant's house fifty to a hundred times, during the two prior years, to drop the child off for visitation. Additionally, appellee testified that he never denied appellant visitation except to prevent her from having contact with Storch.
Based upon the record, it appears that appellee's concern with allowing visitation was based on appellant's relationship with Storch. By the trial court ordering that the child have no contact with Storch, appellee's concerns were alleviated. Hence, we find that there were sufficient facts to enable the court to consider both R.C. 3109.04 (F) (1) (f) and (i).
Appellant's final assertion is that the parent's health was to be considered and, because appellee was permanently and totally disabled, he would certainly have great difficulties in caring for a child. We find, however, that there has been no evidence that appellee was incapable of caring for the child because of his Tourette's syndrome. To the contrary, appellee testified that he cared for the child's needs and nurtured her. The evidence also showed that appellee sought counseling, although he had only gone once. The evidence also established that appellant's mental health was stable and that she received counseling. Hence, we find that there was sufficient evidence concerning the parties' mental and physical health for the trial court to consider when making its determination as to custody.
In addition to the three factors indicated by appellant, we find that the trial court had ample evidence concerning each of the other factors listed in R.C. 3109.04 (F). Moreover, based upon a thorough review of the record, we find that the trial court did not abuse its discretion in determining that the child's best interest would be to live with appellee. Accordingly, appellant's second assignment of error is found not well-taken.
In her third assignment of error, appellant argues that the trial court abused its discretion in denying her motion for new trial. Appellant filed a motion for new trial asserting that a new trial was necessary, pursuant to Civ.R. 59, because the trial court considered incorrect assertions. Specifically, appellant attached copies of a verdict form and judgment entry which showed that Storch was not convicted of rape or sexual imposition in 1994.
"A new trial will not be granted where the verdict is supported by competent, substantial and apparently credible evidence." Verbon v. Pennese (1982), 7 Ohio App.3d 182, 183. InYoussef v. Parr, Inc. (1990), 69 Ohio App.3d 679, 690, the court noted:
 "In considering a motion for new trial, the trial court must exercise its discretion in determining whether a new trial is warranted under the circumstances. An appellate court, when reviewing that decision, may reverse only where it finds an abuse of discretion. The reviewing court is not to substitute its judgment for that of the trial court." (Citations omitted.)
See, also, C.E. Morris Co. v. Foley (1978), 54 Ohio St.2d 279.
The copies of a verdict form and judgment entry attached to appellant's motion for new trial, alone, are insufficient to establish that Storch was never convicted of child molestation. The judgment entry and verdict could have concerned another matter. Besides, if the court did consider Storch's charges in determining not to grant appellant custody, that was only one of a number of factors the court had to consider. Accordingly, we find that the trial court did not abuse its discretion in denying appellant's motion for a new trial. Appellant's third assignment of error is therefore found not well-taken.
Appellant asserts in her fourth assignment of error that the trial court committed plain error in considering the guardianad litem's report. We find, however, that when asked if there was any reason why the guardian's report should not be received and admitted into evidence, and considered by the court. in determining the case, appellant's counsel stated that he had no objection.
Generally in civil cases, errors which arise during the course of the proceedings and are not brought to the attention of the trial court by objection, or otherwise, at the time when such error could have been avoided or corrected, are waived and may not be reviewed on appeal. Goldfuss v. Davidson (1997),79 Ohio St.3d 116, 121; LeFort v. Century 21-Maitland Realty Co.
(1987), 32 Ohio St.3d 121, 123; Civ.R. 51(A). Exceptions to this rule may be allowed in the case of "plain error." The Supreme Court of Ohio, however, has limited the application of the plain error doctrine in civil cases:
 "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. [Citations omitted.]"
Goldfuss at syllabus.
We find that appellant's counsel did not object to the report's admission and, based on the contents of the report, and the testimony received at trial, we find that plain error does not exist. Accordingly, appellant's fourth assignment of error is found not well-taken.
In her fifth assignment of error, appellant argues that the trial court lacked subject matter jurisdiction to consider the issue of custody where a child custody affidavit was not filed. R.C. 3109.27(A) states, "Each party in a parenting proceeding, in the party's first pleading or in an affidavit attached to that pleading, shall give information under oath as to the child's present address, the places where the child has lived within the last five years, and the name and present address of each person with whom the child has lived during that period. * * *." Both parties failed to file such an affidavit in this case.
In Stiles v. Bates (Sept. 18, 1998), Summit App. No. 19292, unreported, the court considered a similar situation with which we are now faced. The party who was not awarded custody by the juvenile court argued that the trial court lacked jurisdiction to determine custody because no party filed a child custody affidavit. In finding the argument not well-taken, the court held as follows:
 "In the instant case, Petitioner alleges that the Juvenile Court did not have jurisdiction to determine custody because no party had filed a child custody affidavit pursuant to R.C. 3109.27. R.C. 3109.27 is part of Ohio's Uniform Child Custody Jurisdiction Act. The statute requires 'each party' to a parenting proceeding to provide the court with a sworn statement that contains information pertaining to the child's present and past residences, with whom they live and have lived, as well as other information pertaining to any other custody proceedings involving the same children. In Pasqualone v. Pasqualone (1980), 63 Ohio St.2d 96, * * * the Supreme Court held:
 " 'The requirement in R.C. 3109.27 that a parent bringing an action for custody inform the court at the outset of the proceedings of any knowledge he has of custody proceedings pending in other jurisdictions is a mandatory jurisdictional requirement of such an action.'
 "This holding was modified In re Palmer (1984), 12 Ohio St.3d 194, 197, * * *:
 " 'The prefatory note to the Uniform Child Custody Jurisdiction Act * * * makes it quite clear that the Act is designed to prevent inter-familial custody tug of wars between differing jurisdictions, not create them. As we noted in Pasqualone, the mandatory jurisdictional requirement applies to "a parent" bringing an action. * * *'
 "The Court further utilized the doctrine of estoppel to find that, under the circumstances of the case, the natural mother was estopped from raising the parties' failure to file a custody affidavit in order to defeat the jurisdiction of the court that had awarded permanent custody of her children to the welfare department. Id. at 196-97.
 "In the instant case, Petitioner has attached the orders of the Juvenile Court granting temporary custody of her children to her mother. The first order entered was dated May 28, 1998. The last order entered was dated August 28, 1998, to become effective if no objections were filed within fourteen days. The last order also indicates that a hearing will be held in regard to custody on September 28, 1998. Nothing in either the petition or the orders attached indicate that Petitioner brought to the attention of the trial court the absence of a custody affidavit. In addition, there is nothing to indicate that any of the information to be provided in the affidavit is not otherwise known to the juvenile court making the custody determination or that other custody proceedings are or were pending so that a potential conflict with another jurisdiction exists. Finally, the only parent to this action is the Petitioner. Her failure to file the affidavit cannot be used as a sword to defeat the jurisdiction of the juvenile court. As stated in Palmer:
 " 'If we were to deny subject-matter jurisdiction by a mechanistic interpretation of R.C. 3109.27, it would be possible for any party to completely obstruct a custody proceeding by willfully failing to file an R.C. 3109.27 affidavit or pleading. Such a result would not only contravene the clear intent of R.C. 3109.27, but could potentially render the custody statutes of this state a nullity. Moreover, such a result would hamstring our long-established rule that ultimately the issue must be what is in the best interests of the child. Under the present circumstances, a rigid interpretation of R.C. 3109.27 would only serve to prolong the agony of the children herein.'
 "We find that the juvenile court is best suited to determine its jurisdiction in this case and the best interests of the children." (Emphasis added.)
Other courts have found, "Where the information required by statute is eventually supplied to the court, and there does not appear to have been any other jurisdiction involved in the custody dispute, a rigid compliance with R.C. 3109.27(A) is not: required and we will not hold void a judgment where the parties failed to comply with it." Christy v. Christy (June 12, 1997), Highland App. No. 96CA902, unreported, citing, Adkins v.Adkins (May 15, 1991), Pickaway App. No. 89CA26, unreported, citing Hawk v. Hawk (Dec. 12, 1990), Athens App. No. 1437, unreported.
We find that strict compliance with R.C. 3109.27, in this case, would not serve the best interests of the child. SeeIn re Palmer, supra. R.C. 3109.27 should not be strictly complied with in this case because appellant knew or should have known that she had an obligation to file an affidavit, but did not do so. Additionally, appellant testified that they had never previously gone to court regarding custody; therefore, there was no fear of jurisdictional competition and conflict with courts of other jurisdictions. Moreover, to allow appellant to prevail on her argument would make it: possible for her to completely obstruct the custody proceeding by willfully failing to file an R.C. 3109.27 affidavit or pleading. See Id.
Accordingly, we find that strict compliance with R.C. 3109.27
is not necessary under the facts and circumstances of this case and that appellant is estopped from raising such an argument. Appellant's fifth assignment of error is therefore found not well-taken.
On consideration whereof, the court orders that the judgment of the Huron County Court of Common Pleas, Juvenile Division, be affirmed, in part, and reversed, in part. Pursuant to App. R. 12(B) this court orders that the child's surname remain the same as her mother's on the child's birth certificate and otherwise. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED, IN PART AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J. ------------------------ JUDGE
James R. Sherck, J. ------------------------ JUDGE
Richard W. Knepper, J. CONCUR. ------------------------ JUDGE