BOBO, APPELLANT, *v.* JEWELL, APPELLEE.

[Cite as Bobo *v.* Jewell (1988), 38 Ohio St. 3d 330.]

(No. 87-1172—Submitted May 10, 1988—Decided September 7, 1988.)

*Gwinn & Wallace* and *Susan L. Gwinn,* for appellant.

*Sowash Law Offices* and *Anne Manley,* for appellee.

H. BROWN, J.

## I

In *Hughes* v. *Hughes* (1988), 35 Ohio St. 3d 165, 518 N.E. 2d 1213, we faced the question of whether a domestic relations court could decree an allocation of the child dependency exemption as permitted in Section 151, Title 26, U.S. Code, to the noncustodial parent, pursuant to the court's broad discretion to determine the appropriate allocation of marital assets and property rights in divorce proceedings. We held that Section 152(e), Title 26, U.S. Code, applicable to tax years beginning after December 31, 1984, did not encroach upon or preempt the exclusive statutory authority of state courts to equitably divide property in divorce proceedings. Our holding recognized that R.C. 3105.18 (which provides that a trial court may divide property as it deems equitable) and past case law mandate that the trial court have broad discretion in arriving at an equitable property division in divorce proceedings, citing *Cherry* v. *Cherry* (1981), 66 Ohio St. 2d 348, 20 O.O. 3d 318, 421 N.E. 2d 1293.

R.C. 3111.13(C) provides that a court may make any order "concerning the duty of support * * * or any other matter in the best interest of the child. * * *" The court of appeals observed that under this provision, a trial court is authorized to order the custodial parent to sign a waiver of the child dependency exemption since such an order "* * * is arguably related to the duty of support imposed upon [the noncustodial parent] * * * in that since he is required to pay child support, he should equitably receive the benefit of such exemption."[1]

However, a parent is not automatically entitled to the exemption when that parent is ordered to pay child support. Parents are *legally obligated* to support their offspring and failure to adequately provide support can result in criminal charges. R.C. 2919.21. Supporting one's children is not an option, but a duty.

Current statistics indicate that it costs, on the average, at least $69,000 to raise a child from birth to age eighteen in the Midwest region of the United States.[2] Requiring the noncustodial parent to pay child support is an attempt to fairly distribute the high costs of raising a child between parents. Even so, commentators state that child support paid by the noncustodial parent often falls short of one half of the actual costs incurred by the custodial parent.[3]

Thus, if a trial court exercises the authority to allocate a child dependency deduction to the noncustodial parent, the record must show that the interest of the child has been furthered.

The considerations which can support an order relating to the dependency allowance are exemplified in *Hughes, supra.* In that case, the record indicates that the court allocated marital property, the burdens of child support and the dependency exemptions in a manner designed to benefit

---

[1] Nevertheless, the court below did not decide this issue because it ruled that Section 152, Title 26, U.S. Code was preemptive of state law and thus precluded the trial court from awarding the dependency exemption to a noncustodial parent.

[2] Calculated by averaging 1986 figures for economy, low, and moderate costs levels in the Midwest region, Beninger & Smith, Determining Child & Spousal Support (1987 Cum. Supp.), Section 460, Tables 4-10 through 4-12.

[3] See Beninger & Smith, *supra,* at Section 521.

the children while lessening the income tax obligations of the parents by increasing the level of child support awarded and giving the dependency exemptions to the parent who would benefit the most from them—in this circumstance, to the noncustodial father whose gross income exceeded that of the custodial mother. Awarding the dependency exemptions to the parent in the higher tax bracket so that the higher-earning parent could pay more child support achieved an equitable result overall.

In the present case, there was no showing that the allocation of the dependency exemption to the noncustodial parent was in the best interest of the child. Therefore, it is unnecessary to decide whether Section 152(e), Title 26, U.S. Code is applicable to parents who have never been married.

Though we resolve the matter on different grounds, we affirm the decision of the court of appeals.

## II

The remaining issue concerns the trial court's judgment changing the child's last name from Jewell to Bobo. The threshold question is: Was the juvenile court authorized to change the child's name after it established that Timothy was the child's father? If we find that the trial court has this power, we must determine whether the court of appeals was correct in ruling that there was insufficient evidence as a matter of law to support the trial court's judgment changing the child's last name.

---

[4] Note, The Controversy over Children's Surnames: Familial Autonomy, Equal Protection and the Child's Best Interests (1979), 23 Utah L. Rev. 303, 312 (hereinafter "Utah Note").

[5] Even though Timothy testified that

## A

At early common law an illegitimate child was not given the surname of the mother or father; the child acquired a surname by reputation. Gradually it became the custom that an illegitimate child assumed the mother's surname at birth, probably because of the traditional view that the unmarried mother possessed stronger parental rights regarding the child than did the putative father.[4] Many states have incorporated aspects of this custom into law. In Ohio, an illegitimate child must be given the surname of its mother at birth unless both parents sign the birth certificate as informants and both the mother and father designate that the child is to be given the father's surname. R.C. 3705.14. Under this provision, Christopher's surname was correctly established at birth.[5] Our opinion, therefore, is confined to the narrow question of changing an illegitimate child's surname after parentage has been established.

In Ohio, names may be changed either by resorting to a judicial proceeding or by the common-law method of simply adopting a new name, so long as the change is not made for fraudulent purposes. *Pierce* v. *Brushart* (1950), 153 Ohio St. 372, 380, 41 O.O. 398, 402, 92 N.E. 2d 4, 8. There is authority which holds that parental petitions to change the name of a minor fall within the exclusive jurisdiction of the probate court. *In re Russek* (1974), 38 Ohio App. 2d 45, 67 O.O. 2d 260, 312 N.E. 2d 536; *Dolgin* v. *Dolgin* (1965), 1 Ohio App. 2d 430, 30 O.O. 2d 435, 205 N.E. 2d 106. However, Tim-

Christina had not asked him to sign Christopher's birth certificate as an informant, the child could not have been given Timothy's surname without permission of both parents.

othy requested the name change for the child in the context of a parentage action pursuant to R.C. 3111.04(A) filed in the juvenile division of the common pleas court. *Russek, supra,* and *Dolgin, supra,* are inapposite to the instant case. *Russek* and *Dolgin* concern situations in which the custodial mother, after divorce, sought to change the children's paternal surnames in judicial proceedings, and both cases predated the June 29, 1982 enactment of R.C. 3111.13(C) (139 Ohio Laws, Part I, 2170, 2187, 2188), which authorizes the court to make any other provision in its order that is in "the best interest of the child."

Further, when the court's order varies from the child's birth certificate, the court is authorized pursuant to R.C. 3111.13(B) to order a new birth certificate to be issued. This denotes legislative recognition that a court has the power to order a change in the child's name.

It is axiomatic that once the parent-child relationship has been established, this fact has a profound impact upon the relationship of the child with both parents. The issue of what name the child should bear arises from this newly recognized relationship. If the parents disagree, then the court must intercede on behalf of the child as a disinterested arbiter.

Accordingly, we hold that pursuant to R.C. 3111.13(C), a court of common pleas may determine the surname by which the child shall be known after establishment of the existence of the parent and child relationship, and a showing that the name determination is in the best interest of the child.

## B

In determining whether to allow a change in the child's name, most courts follow the rule that the request should be granted only upon finding that it is "in the best interest of the child." See *In re Marriage of Schiffman* (1980), 28 Cal. 3d 640, 647, 169 Cal. Rptr. 918, 922, 620 P. 2d 579, 583; *Sullivan* v. *McGaw* (1985), 134 Ill. App. 3d 455, 464, 480 N.E. 2d 1283, 1291; *In re Russek, supra; In re Newcomb* (1984), 15 Ohio App. 3d 107, 110, 15 OBR 198, 201, 472 N.E. 2d 1142, 1145; and Annotation, Rights and Remedies of Parents Inter Se with respect to the Names of their Children (1979), 92 A.L.R. 3d 1091, 1095.

We agree with the court of appeals' conclusion that R.C. 3111.13(C) requires Ohio courts to follow the same rule. We caution the courts, however, to refrain from defining the best-interest-of-the-child test as purporting to give primary or greater weight to the father's interest in having the child bear the paternal surname. While it may be a custom to name a child after the father, giving greater weight to the father's interest fails to consider that, where the parents have never been married, the mother has at least an equal interest in having the child bear the maternal surname. In these times of parental equality, arguing that the child of unmarried parents should bear the paternal surname based on custom is another way of arguing that it is permissible to discriminate because the discrimination has endured for many years.[6]

In determining the best interest of

---

[6] Utah Note, *supra,* at 311, fn. 35. The custom of bestowing the paternal surname upon a child apparently originated in England's medieval social and legal system which vested all rights of ownership and control of the marital property in the husband. See Utah Note at 304-306. Permitting the husband to determine the surname of the child was part of that system, wherein the husband was the legal rep-

the child concerning the surname to be used when parents who have never been married contest a surname, the court should consider: the length of time that the child has used a surname, the effect of a name change on the father-child relationship and on the mother-child relationship, the identification of the child as part of a family unit, the embarrassment, discomfort or inconvenience that may result when a child bears a surname different from the custodial parent's, the preference of the child if the child is of an age and maturity to express a meaningful preference, and any other factor relevant to the child's best interest. Courts should consider only those factors present in the particular circumstances of each case.

In applying the above standard to the facts before us, we note that the mother is the custodial parent, that the child has been known by the mother's surname, and that no evidence in the record supports the conclusion that the change in name is in the best interest of the child. Where, as here, there is insufficient evidence, as a matter of law, to support the trial court's judgment changing the child's last name, the court of appeals properly reversed that part of the trial court's order. App. R. 12(B); *Superior Metal Products, Inc.* v. *Ohio Bur. of Emp. Serv.* (1975), 41 Ohio St. 2d 143, 70 O.O. 2d 263, 324 N.E. 2d 179. We affirm the court of appeals and enter final judgment that the child of the parties shall be known as Christopher Ryan Jewell.

For reason of the foregoing, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER and HOLMES, JJ., concur.

MOYER, C.J., concurs in part and in syllabus and judgment only.

DOUGLAS and WRIGHT, JJ., concur in the syllabus and judgment only.

MOYER, C.J., concurring in part and in syllabus and judgment only. I concur in Part II of the majority opinion and with the holding that the judgment of the court of appeals should be affirmed, and I concur in both paragraphs of the syllabus.

However, I disapprove of the majority's reliance upon *Hughes* v. *Hughes* (1988), 35 Ohio St. 3d 165, 518 N.E. 2d 1213, to support its affirmance of the court of appeals' judgment because I believe *Hughes* v. *Hughes* was incorrectly decided.

DOUGLAS, J., concurring in syllabus and in judgment only. I agree with Part II of today's opinion, and with the majority's holding that the judgment of the court of appeals should be affirmed, but I disagree so completely with Part I that I feel compelled to write separately to express my concerns.

First and foremost, I strongly disapprove of the majority's reliance on and reaffirmation of *Hughes* v. *Hughes* (1988), 35 Ohio St. 3d 165, 518 N.E. 2d 1213, a decision that was just plain wrong when it was decided and whose errors are compounded today. The *Hughes* decision was fatally flawed in many respects, some of which were discussed in Justice Wright's dissent

resentative of the marriage, its property and its children. Kay, Sex-Based Discrimination (2 Ed. 1981) 163-165. With the enactment of Married Woman's Acts in the mid-Nineteenth Century, wives were returned their separate legal identities, which largely dissolved the bases for patrimonial control of surnames.

thereto, in which I concurred. *Id.* at 168-170, 518 N.E. 2d at 1216-1218.

One of the more profound errors contained in *Hughes,* and repeated today, is the characterization of the dependency exemption as marital property which may be allocated by the trial court in the exercise of its inherent authority to determine property rights in divorce proceedings. *This exemption is not an item of property.* No one *owns* it. The right to claim this exemption is a matter determined by the federal government pursuant to statute, a right which may, under some circumstances, properly be claimed by one person one year and by a different person the next. By characterizing the allocation of the exemption as part and parcel of a property division, the majority makes it possible for trial courts to grant one party a fixed and immutable entitlement to claim the exemption every year until the child is no longer a dependent. This allocation inevitably becomes permanent by virtue of the well-settled principle that courts do *not* retain continuing jurisdiction over orders which constitute a division of marital property. *Wolfe* v. *Wolfe* (1976), 46 Ohio St. 2d 399, 75 O.O. 2d 474, 350 N.E. 2d 413. Thus, according to *Hughes* and today's majority opinion, the right to claim the exemption, once fixed, is forever a closed question, no matter how circumstances may change in the future. Even if custody of the child is altered, the exemption will remain with the party who originally "won" the right to claim such exemption.

This is absurd. In its effort to defend the indefensible, the majority has succeeded only in making a bad situation worse. The lead opinion further compounds the errors in *Hughes* by running roughshod over the relevant section of the federal tax code.

Section 152(e), Title 26, U.S. Code provides the rule to be followed in determining which parent may claim the dependency exemption. Today's majority holds that trial courts are somehow authorized to use a different set of criteria to make their own determinations independent of the federal statute. Again, I am in thorough agreement with Justice Wright's conclusion, in his dissent to *Hughes, supra,* that a state court has no power to award a dependency exemption on terms which are inconsistent with the explicit language of Section 152, Title 26, U.S. Code. *Id.* at 169-170, 518 N.E. 2d at 1217. A majority of this court may very well believe that the exemption should be awarded according to certain equitable considerations, but Congress has clearly seen fit to provide its own criteria. No matter what the personal beliefs of the majority may be on this matter, this court is not free to fashion what might be called an "Ohio rule" on *federal* tax exemptions.

The majority finds it unnecessary to decide the question of whether Section 152(e) applies to parents who were never married. In actuality, the majority has already decided that Section 152(e) may be disregarded no matter what the marital status of the parents. By holding that a trial court may allocate the exemption to the non-custodial parent where the record shows that the interest of the child is furthered, the majority has authorized trial courts to bypass the automatic allocation mandated by Section 152(e).

The relevant portion of Section 152(e) provides:

*"Support test in case of child of divorced parents, etc.—*

"(1) Custodial parent gets exemption.—Except as otherwise provided in this subsection, if—

"(A) a child (as defined in section 151(c)(3)) receives over half of his sup-

port during the calendar year from his parents—

"(i) who are divorced or legally separated under a decree of divorce or separate maintenance,

"(ii) who are separated under a written separation, or

"(iii) *who live apart at all times during the last 6 months of the calendar year,* and

"(B) such child is in the custody of one or both of his parents for more than one-half of the calendar year, such child shall be treated, for purposes of subsection (a), as receiving over half of his support during the calendar year from the parent having custody for a greater portion of the calendar year (hereinafter in this subsection referred to as the 'custodial parent')." (Emphasis added.)

Section 152(e) is perfectly unambiguous, and the intent is clear. Sections 152(e)(1)(A)(i) through (iii) set forth three categories of parents to whom the section applies. Among these categories are parents "who live apart at all times during the last 6 months of the calendar year * * *." Absolutely nothing in this language indicates a requirement that this category is limited to parents who are or were ever married.

That Congress did not intend Section 152(e) to be limited to parents who are or were married is made even clearer when one considers the purpose underlying the changes which brought the statute to its present form. The House Committee on Ways and Means, in a report explaining these changes, stated:

"The present rules governing the allocations of the dependency exemption are often subjective and present difficult problems of proof by substantiation. The Internal Revenue Service becomes involved in many disputes between parents who both claim the dependency exemption based on providing support over the applicable thresholds. The cost to the parties and the Government to resolve these disputes is relatively high and the Government generally has little tax revenue at stake in the outcome. The committee wishes to provide more certainty by allowing the custodial spouse[7] the exemption unless that spouse waives his or her right to claim the exemption. Thus, dependency disputes between parents will be resolved without the involvement of the Internal Revenue Service." (Footnote added.) H.R. Rep. No. 98-432, 98th Cong., 1st Session, Vol. I, 197-198 (1983).

Obviously, the purpose behind the automatic grant of the exemption to the custodial parent (absent waiver) was to reduce the number of disputes caused by the uncertainty of the former law. Excluding unwed parents from coverage under the new law would frustrate rather than advance this purpose. The disputes which Section 152(e) was designed to eliminate are no less likely to occur between unwed parents, both of whom may desire to take advantage of the exemption.

---

[7] The committee's use of the word "spouse" cannot be considered an indication that only married persons are covered. If the committee had truly meant the section to refer only to spouses, divorced custodial parents would not be covered, since they are no longer spouses. I would also emphasize that the terms "parent" and "parents" are repeatedly used, without qualification, throughout this portion of the committee report, a fact which is much more significant than the committee's obviously casual use of the term "spouse."

Today's opinion, when considered with *Hughes, supra,* and other recent decisions of this court,[8] reveals an alarming trend. This court has, by these decisions, demonstrated a willingness to tolerate an increasing phenomenon: the impoverishment of women, and often children, as a result of divorce. Households headed by women, often a product of divorce or unwed motherhood, are the fastest growing sector of the poor in America. Weitzman, The Divorce Revolution: The Unexpected Social and Economic Consequences for Women and Children in America (1985) 351. The language contained in today's majority decision and in *Hughes* will be used time and again to batter the legal status of America's new poor. We must devise a more balanced approach if we want to avoid complete economic catastrophe for the next generation.

WRIGHT, J., concurs in the foregoing opinion.

---

[8] *Kaechele* v. *Kaechele* (1988), 35 Ohio St. 3d 93, 518 N.E. 2d 1197; *Volodkevich* v. *Volodkevich* (1988), 35 Ohio St. 3d 152, 518 N.E. 2d 1208.