DECISION AND JUDGMENT ENTRY
We sua sponte consolidate two related appeals from the Juvenile Court of Washington County. Case No. 98CA4 is an appeal by the paternal grandparents, Tony and Karen Bradley [hereinafterBradleys], of the decision of that court granting custody of the child, Tyler Harrison Ramey [hereinafter Tyler], to non-relatives John and Cheryl Ramey [hereinafter Rameys]. The trial court awarded custody to the Rameys on January 8, 1998, and established, by that order, a schedule for visitation by the father, Tony Bradley, II [hereinafter Tony II], with Tyler. At that time, Tony II lived with his mother and father, Karen and Tony Bradley.
In March 1998, the Rameys moved for supervised visitation, alleging improper contact with the child by the father and paternal grandfather. The trial court clarified the terms of its earlier visitation order but denied the motion for supervised visitation. The Rameys appeal from that decision of the trial court, Case No. 98CA28.
The Rameys met Crystal "Crissy" Umensetter [hereinafterCrystal], a nineteen year-old waitress, in a Belpre, Ohio, restaurant in early 1995. In March 1995, John Ramey learned that Crystal was pregnant and was considering either an abortion or placing the baby for adoption. The Rameys and Crystal reached an agreement whereby the Rameys would take custody of the child at birth, for purposes of adoption.
Crystal informed the Rameys that the father of the unborn child was one Mark Metz [hereinafter Mark], whom she had considered marrying until she learned of his propensity to become abusive when drunk. Subsequently, John Ramey contacted Mark and received his verbal consent to the plan to adopt the child.
The Rameys and Crystal contacted an attorney in May 1995, seeking advice regarding this adoption. Crystal advised the attorney that John Ramey was the father of the child. The attorney prepared several documents including a document entitled "Consent for Medical Treatment, Power of Attorney," a document entitled "Consent to Adoption and Permanent Surrender of Child," and an Ohio form Acknowledgment of Paternity. Crystal later returned in June to the attorney's office and signed these documents.
During the remaining months of Crystal's pregnancy, the Rameys attended Lamaze classes with her, bought maternity clothes, food, extra ultrasounds, and had daily contact with the mother regarding the well being of both Crystal and the child. Crystal's mother, Linda Buchanan [hereinafter Linda], also had contact with the Rameys. Crystal was comfortable with the Rameys and introduced them as the adopting parents of her unborn child during her pregnancy.
Independent witnesses also testified that Crystal had little interest in her pregnancy or in rearing the child. She referred to the child as "it" and expressed more concern for her anticipated post-birth freedom than for the welfare of the child. It is also uncontroverted that Linda, the Rameys, and Mark were all advised by Crystal that Mark was the father of the child.
Tyler was born on July 17, 1995, at St. Joseph's Hospital in Parkersburg, West Virginia. The Rameys were present at birth. Cheryl Ramey cut the umbilical cord. After birth, Crystal refused to hold or feed the child, even though Cheryl Ramey and a nurse repeatedly tried to persuade her to take the child. When the child left the hospital, it was with the Rameys and with the consent of Crystal. While Crystal named the boy "Ramey" on the West Virginia birth certificate, she did not consent to listing John Ramey as the father on this document.
Sometime in September 1995, after the birth of the child, Crystal's mother, Linda, discovered a letter written by Crystal to Tony II, an old boyfriend of Crystal's, which indicated Tony II was actually the father of Tyler.
At trial, testimony established that Crystal advised Tony II during the pregnancy that he was the father of the child. In May 1995, Tony II introduced Crystal to his parents, Tony and Karen Bradley. Soon after, Crystal and Tony II ended their relationship because Tony II refused to end his relationship with another woman. There appeared to be no further contact by the Bradleys with Crystal during the pregnancy.
At the time of Tyler's birth, Tony II had been arrested for probation violation. He was on probation in both West Virginia and Ohio for burglaries committed in 1993. The West Virginia burglary was at the home of Linda, Crystal's mother. In August 1995, he was incarcerated for the violation of his Ohio probation.
Tony II renewed his relationship with Crystal by telephone from the prison. Crystal began to have second thoughts about giving up her child to the Rameys. The Bradleys arranged for Crystal to contact an attorney from legal aid.
These proceedings commenced when Crystal filed a habeas corpus petition with the Juvenile Court of Washington County on November 30, 1995, seeking the return of the child to her. Included with the petition was the affidavit of Tony II stating his parentage of the child. In response, the Rameys filed their motion for custody of the child. The matter was set for hearing in February 1996, but was continued by the court to allow time for the completion of paternity testing. The court orders placed temporary custody of the child with the Rameys during the pendency of the action and provided for visitation by Crystal.
On August 20, 1996, the Bradleys entered their appearance in this matter. On September 23, 1996, Crystal's counsel withdrew, and on that same date the Bradleys moved for custody, or in the alternative, for visitation with the child.
Attached to the Bradleys' custody petition was a Washington County Child Support Enforcement Agency "administrative order" dated September 5, 1996, which purported to establish paternity of Tyler, and copies of a genetic testing report. This latter document stated that genetic testing indicated a 99.99% probability that Tony II was the father of Tyler. It appears from the record that the trial court established the paternity of Tyler, naming Tony II as Tyler's father, by order issued under a separate case number on October 23, 1996.
The trial court scheduled a hearing on the visitation motion for November 14, 1996. On November 13, 1996, Linda, the maternal grandmother, petitioned for custody of the child, or, alternatively, for visitation. On November 17, 1996, the trial court approved temporary orders for visitation by the paternal grandparents. On November 21, 1996, Crystal withdrew her habeas corpus petition.
At the three-day trial of these matters, June 16, 17, and 18, 1997, the father, Tony II, entered his appearance and his oral motion for custody. The natural mother, Crystal, appeared only on the last day of trial and then only under subpoena to testify as a witness for the Bradleys.
The trial court issued its decision on January 8, 1998, awarding custody to the Rameys and visitation to the father, Tony II; his parents, the Bradleys; and the maternal grandmother, Linda. The trial court also denied a motion submitted by the Bradleys at trial requesting change of the child's name to Tyler Vendez Bradley. The Bradleys filed their timely appeal, designated here as Case No. 98CA4. The Bradleys set forth three assignments of error:
 I. THE TRIAL COURT ERRED BY CONFIRMING A PLACEMENT IN A NON-RELATIVE OF A BABY IN CONTRAVENTION OF THE ADOPTION STATUTES AND CUSTODY STATUTES.
 II. THE COURT ERRED IN FINDING THAT THE NATURAL FATHER WAS UNSUITABLE.
 III. THE TRIAL COURT ERRED IN REFUSING TO CHANGE THE CHILD'S SURNAME TO THE NATURAL FATHER RATHER THAN A STRANGER'S NAME.
On August 8, 1997, the Rameys filed a motion for supervised visitation. On August 17, 1997, the Bradleys filed a motion to show cause against the Rameys for denying visitation. On September 23, 1997, the trial court denied the Rameys' motion and granted the Bradleys' motion for contempt, assessing attorney fees against the Rameys. On March 23, 1998, the Rameys again filed a motion seeking supervised visitation, as well as an order for support from the father. The Bradleys moved for summer visitation.
On June 19, 1998, the trial court deferred ruling on the request for child support, denied the motion for supervised visitation, and clarified its January 8, 1998 order. The court, in denying the Bradleys' request for summer visitation, stated that the January order granted standard visitation only to the father and not to the paternal grandparents. On July 24, 1998, the trial court determined the amount of support due from Tony II. From that final appealable order the Rameys appealed, setting forth one assignment of error:
 I. THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO FOLLOW THE FACTORS IN REVISED CODE SECTION 3109.051
IN REGARDS TO A MODIFICATION OF VISITATION.
 Opinion
We initially note that neither Tyler's natural mother, Crystal, nor the father, Tony II, entered an appearance or briefed the issues in either appeal. It appears from the record that the mother appeared at trial only as a witness, while the father appeared pro se. Nor has counsel for Linda, the maternal grandmother, entered an appearance in either appeal.
We are issuing a consolidated decision in Case Nos. 98CA4 and 98CA28, but will address each assignment of error separately. To avoid confusion, we identify the respective appellants and appellees in each appeal by name, rather than as appellants and appellees.
 Case No. 98CA4: Bradley Appeal
The Bradleys' first two assignments of error raise three related issues: first, that the trial court erred by confirming "placement" of Tyler with non-relatives; second, that the trial court erred in granting custody to a non-relative; and third, that the trial court improperly found Tony II an "unsuitable" parent in order to justify placement of the child with a non-relative.
The Bradleys argue that "placement" of Tyler with non-relatives by Crystal was in direct contravention of R.C. 5103.16. That section provides that a child may not be placed in the temporary custody of any person without the written consent of the Department of Human Services. They argue further that R.C.2151.03(A)(5) would render Tyler a "neglected" child because of his mother's attempt to place him in the custody of the Rameys.
Citing In Re Adoption of Zschach (1996), 75 Ohio St.3d 648,665 N.E.2d 1070, and R.C. 3107.14(D), the Bradleys apparently argue that the custody motion of the Rameys should have been dismissed as a "black-market" adoption transaction. Citing R.C. 3107.08 andIn Re Adoption of Infant Girl Banda (1988). 53 Ohio App.3d 104,559 N.E.2d 1373, they claim that various expenditures by the Rameys are evidence of a "purchase" of Tyler from Crystal by the Rameys, in contravention of public policy.
We decline the Bradleys' invitation to treat this matter as an adoption proceeding. The record is clear that this matter is fundamentally an action for custody under R.C. 2151.23. There is no indication in the record of a pending petition for adoption in the Probate Court of Washington County or any other court in this state.
In the case at bar, the mother abandoned the child at birth to the Rameys. The putative father, Mark, had no objections to this arrangement, nor did the maternal grandmother, Linda. Tyler was born on July 17, 1995. The Rameys did not know of the existence of Tony II as a possible second putative father until Crystal filed her petition for habeas corpus on November 30, 1995. While Tony II admitted his parentage by affidavit attached to that petition, he took no further steps at that time to assert his parental rights.
Hence, in 1995, the trial court was faced with the difficult choice of either returning the child to the mother who had abandoned the child at birth or allowing the child to remain in the temporary care of the Rameys, as he had been since birth. The court had sufficient evidence before it to determine that there were two possible fathers of Tyler: Mark or Tony II.
However, the trial court did not have sufficient evidence before it to support a placement with either putative father, pending resolution of the paternity issue. Nor did it even have a motion before it suggesting such a placement. The Bradleys were not to file their motion for custody until late the following year. Nothing in the record suggests that either Mark or Tony II provided any significant support for mother or child or participated in nurturing the child.
A finding of a violation of R.C. 5103.16, standing alone, is not sufficient to support a finding of child neglect, other evidence of that neglect being required. See In Re Erin N. (Apr. 12, 1996), Erie App. No. E-95-029, unreported. It does not appear that the record below sufficiently supported a finding of neglect, as defined by R.C. 2151.03. The 1995 order of the trial court granted visitation to the mother, but the record clearly indicates that she had voluntarily abandoned these rights by April 1996. We are not prepared, therefore, to second-guess the decision of the trial court to grant temporary custody to the Rameys while paternity was being determined.
The laboratory did not return the genetic test report until August 30, 1996. Tony II's parentage was established on October 23, 1996. Shortly thereafter, the natural mother, Crystal, withdrew her motion for custody. Hence, at the conclusion of the three day trial in June 1997, the trial court had before it four motions for the custody of Tyler:
1. The original motion of the Rameys, filed in 1995;
 2. The motion of the paternal grandparents, the Bradleys, filed in 1996; 3. The motion of the maternal grandmother, Linda, also filed in 1996; and,
 4. The oral motion of the father, Tony II, entered at trial in 1997.
The current law in the State of Ohio is that an unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian. See R.C. 3109.042, which became effective on January 1, 1998.[1] This statute codifies the concept of the mother's "implied custody" from In Re Yates
(1984), 18 Ohio App.3d 95, 481 N.E.2d 646, thereby requiring custody disputes of unmarried parents to be resolved by the courts.
A court designating the residential parent and legal custodian of a child described in this section shall treat the mother and father as standing upon an equality when making the designation. R.C. 3109.042. In a proceeding under R.C. 2151.23(A)(2) to establish custody, the court must follow R.C. 3109.04. See R.C.2151.23(E). In Re Ragland (Aug. 16, 1983), Franklin App. No. 83AP-113, unreported, and Yates, supra, applied R.C.3109.04(E)(1)(a), and required the natural father to show a change in circumstances before the court could consider his motion. However, R.C. 3109.042 clearly rejects this view. Instead, the court must apply the "best interest" test of R.C.3109.04(F), and the factors listed therein, following In Re Byrd
(1981), 66 Ohio St.2d 334, 421 N.E.2d 1284. Therefore, the trial court must balance the competing interests of the natural parents with the child's best interest to determine if either parent would be a suitable custodian for the child.
In the court below, testimony at trial established that the natural mother, Crystal, last had contact with the child in April 1996. While the court established the father's parentage in October 1996, Tony II did not move for custody until the first day of trial, June 16, 1997, although he had visitation with his son under the temporary orders granting visitation with Tyler to his natural parents. The Bradleys argue that the trial court improperly found Tony II to be an "unsuitable" parent and, therefore, the trial court erred in awarding custody to the Rameys.
 The Supreme Court of Ohio held in In Re Perales (1977), 52 Ohio St.2d 89, 369 N.E.2d 1047, syllabus, that:
 In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability — that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child.
However, in Reynolds v. Goll (1996), 75 Ohio St.3d 121, 123,661 N.E.2d 1008, 1010, the court stated that "the welfare of the minor is first to be considered," citing Clark v. Bayer (1877),32 Ohio St. 299, 310. In Reynolds, the custody contest was between the natural father, Goll, and Reynolds, who had cared for the child since shortly after her birth. Goll, a part-time security officer at a hospital, was the father of three other children when this child was born. His wife died soon after the birth of the child, and Goll allowed Reynolds, a nurse at the hospital, to take care of the child.
The court in Reynolds did not abandon the Perales standard of a parent's "paramount right" to custody. Instead, it narrowed the test for unsuitability. It is not required that the court find the parent unsuitable to be a parent in general. It is only necessary to find that the parent is unsuitable to have custody of this specific child. It is the child's right to have a suitable custodian, and the harmful effects of granting custody to this parent, not society's judgment of the parent, that must be weighed. See Krichbaum v. Graham (Oct. 14, 1997), Ashland App. No. 97 COA 01203, unreported.
The record in the court below establishes that the natural mother, Crystal, abandoned the child at birth. Even after the court granted her visitation, she only exercised this visitation for a few months. We cannot dispute the finding of the trial court that Crystal was an unsuitable parent. Nor can we dispute the conclusion of the trial court that Tony II is an unsuitable parent. Tony II was in jail from shortly after the birth of Tyler in July 1995 until March 1997. He did not move for custody until the first day of the trial, June 16, 1997, when he entered his oral motion. At the time of trial he was unemployed and had no concrete plans for supporting himself. We find the detennination of the trial court, that neither parent is a suitable custodian of this child, to be supported by competent and credible evidence. Masitto v. Masitto (1986), 22 Ohio St.3d 63,488 N.E.2d 857.
We are mindful of the established rule that "in proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important."Trickey v. Trickey (1952), 158 Ohio St. 9, 13, 106 N.E.2d 772,774. As the Supreme Court of Ohio stated in Miller v. Miller
(1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849:
 The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. (Citations omitted.)
In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80, 461 N.E.2d 1273, 1276. This court has previously stated that trial courts are vested with broad discretion in matters of child custody. In Re Whaley (1993), 86 Ohio App.3d 304,620 N.E.2d 954.
An abuse of discretion standard of review requires us to find that the trial court demonstrated an unreasonable, arbitrary or unconscionable attitude and not merely that we might disagree with the results and position of the lower court. See Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140,1142. Nor, are we to reweigh the evidence. C. E. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578. The trial court had the benefit of findings and reports, resulting from psychological examinations of all the parties. In addition, the trial court had the benefit of personally hearing the testimony of the parties and witnesses in a three-day trial. We find the decision of the trial court, that the best interest of the child is that he should remain with the Rameys, to be supported by competent and credible evidence.
We, therefore, refuse to find that the trial court abused its discretion in the custody award. Reynolds, supra.
Accordingly, the Bradleys' first two assignments of error are OVERRULED.
 II
In their Third Assignment of Error, the Bradleys argue the trial court erred by refusing to change the child's name. The Supreme Court of Ohio held as follows in Bobo v. Jewell (1988),38 Ohio St.3d 330, 528 N.E.2d 180, syllabus:
 1. Pursuant to R.C. 3111.13(C), a court of common pleas may determine the surname by which the child shall be known after establishment of the existence of the parent and child relationship, and a showing that the name determination is in the best interest of the child.
 2. In determining the best interest of the child concerning the surname to be used when parents who have never been married contest a surname, the court should consider: the length of time that the child has used a surname, the effect of a name change on the father-child relationship and on the mother-child relationship, the identification of the child as part of a family unit, the embarrassment, discomfort or inconvenience that may result when a child bears a surname different from the custodial parent's, the preference of the child if the child is of an age and maturity to express a meaningful preference and any other factor relevant to the child's best interest. Courts should consider only those factors present in the particular circumstances of each case.
When reviewing a decision whether a child's name should be changed, a reviewing court is not free to substitute its judgment for that of the trial court. See Jarrells v. Epperson (1996),115 Ohio App.3d 69, 71, 684 N.E.2d 718, 720. The determination of what is in the best interest of the child is within the sound discretion of the trial court. See In re Jane Doe 1 (1990),57 Ohio St.3d 135, 566 N.E.2d 1181.
The Bradleys cite Malec v. Houser (Mar. 16, 1994), Washington App. No. 93CA14, unreported, in support of their position, but that case is clearly distinguishable on its facts from the case at bar. In Malec, as in Bobo, the dispute was between the unmarried mother and the father of the child. Unlike Bobo, inMalec the parties had generally reached agreement on most other issues regarding the welfare of their child, and the father of the child had participated in the raising of the child.
In Bobo, as well as in the case before us, the name of the child was but one of the many issues in contention. Resolution of the issue of the child's name naturally related to the resolution of other issues of custody, support, and the best interests of the child, in the face of the competing interests of the parties. Three of the factors cited by the Supreme Court of Ohio in Bobo
are the length of time the child has been known by that name, the identification of the child as part of a family unit, and the embarrassment, discomfort, or inconvenience that may result when the child bears a surname different from the custodial parents.
At the time of the decision below, Tyler was two and one-half years old. The trial court determined that it was in the best interest of the child that he remained with the only family he has known, the Rameys, rather than either his natural father or his paternal grandparents. The child has been known by the name "Ramey" since birth.
Tyler is a biracial child, his mother is white, and his father is black. The Rameys are white, John in his sixties, Cheryl, in her forties. Cheryl has two teenage sons by a former marriage. The testimony in the record from the psychologist and other independent witnesses indicates that Tyler is a happy and intelligent child, integrated with, and accepted by, the Ramey family, including Cheryl's two teenage sons. We find the decision of the trial court to retain the family name of "Ramey" to be a reasonable attempt to retain the child's identification with this family unit.
Finally, as Tyler grows older, there is the factor of the embarrassment or inconvenience a child may suffer where he has a name that differs from his custodians. See Scot D. v. Tricia W.
(Feb. 6, 1998), Erie App. E-97-106, unreported.
We find no abuse in discretion by the trial court in refusing to change the child's name. Accordingly, the Bradleys' Third Assignment of Error is OVERRULED.
 Case No. 98CA28: Ramey Appeal
On March 23, 1998, the Rameys filed a motion requiring that visitation be supervised until allegations of physical and sexual abuse by the father and paternal grandfather could be resolved. At the hearing on their motion in June 1998, the Rameys presented the testimony of Cynthia Spalding, a licensed psychologist, to support their allegations.
However, the testimony of the witness from Washington County Children Services did not support the Rameys' allegations of possible abuse, nor did the Rameys submit specific medical evidence to support their allegations.
The trial court has broad discretion in determining visitation rights of a non-custodial parent, within the limits provided by R.C. 3109.051(D). See Braatz v. Braatz (1999), 85 Ohio St.3d 40,706 N.E.2d 1218; Appleby v. Appleby (1986), 24 Ohio St.3d 39,492 N.E.2d 831; In Re Whaley at 317. A nonresidential parent's right to visitation with his child is a natural right and should be denied only under extraordinary circumstances. Pettry v.Pettry (1984), 20 Ohio App.3d 350, 352, 486 N.E.2d 213, 215. The trial court may differ with the recommendations of a psychologist if its findings are supported by the evidence. Frost v. Frost
(1992), 84 Ohio App.3d 699, 709, 618 N.E.2d 198, 204; Cupp v.Cupp (Nov. 24, 1998), Allen App. No. 1-98-48, unreported.
Balancing the results of psychological testing of a child of some three years in age against the lack of any specific medical evidence, we are unable to find that the trial court abused its discretion in denying the motion for supervised visitation.
We, therefore, OVERRULE the Rameys' sole assignment of error.
Accordingly, the judgment of the trial court in both these matters, consolidated hereby, is AFFIRMED.
JUDGMENT AFFIRMED.
[1] The original proposal submitted by the Ohio State Bar Association representative to the bill sponsor read "residential parent or legal custodian."
 JUDGMENT ENTRY
It is ordered that the judgments appealed from be affirmed.
John and Cheryl Ramey are to pay the costs in Case No. 98CA28.
Tony and Karen Bradley are to pay the costs in Case No. 98CA4
The court finds that there were reasonable grounds for these appeals.
It is ordered a that special mandate issue out of this court directing the Juvenile Court of Washington County to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
ABELE, J.: Concurs in Judgment and Opinion.
 KLINE, P.J.: Concurs in Judgment and Opinion as to Case No. 98CA28; Concurs in Judgment Only as to Case No. 98CA4.
For the Court
 By:______________________ DAVID T. EVANS, Judge
 NOTICE TO COUNSEL Pursuant to Local Rule No. 14, this document constitutes afinal judgment entry and the time period for further appealcommences from the date of filing with the clerk.