IN RE WILLHITE.

[Cite as *In re Willhite* (1999), 85 Ohio St.3d 28.]

(No. 97–2587—Submitted December 1, 1998—Decided March 17, 1999.)

*Rebecca K. Kaye,* for appellant Janet M. Williams.

*Sal G. Scrofano,* for appellee Guy L. Willhite.

LUNDBERG STRATTON, J. "What's in a name?" Shakespeare asked. Shakespeare, Romeo and Juliet, Act II, Scene ii. "An individual's name is important because it symbolizes familial lineage and heritage and represents one's legal identity." Kennedy–Sjodin, *Keegan v. Gudahl:* The Child's Surname as a New Bargaining Chip in the Game of Divorce (1996), 41 S.D.L.Rev. 166.

As Justice Snell's dissent in *In re Marriage of Gulsvig* (1993), 498 N.W.2d 725, 730, so aptly summarized, "The importance of names in society is of ancient origin. * * * Elsdon C. Smith in The Story of Our Names (1930) observed that except to the most intimate friends a person's name is the most prominent feature. It is also the most vulnerable point. An old Roman maxim runs, 'Sine nomine homo non est' (without a name a person is nothing). One's name is a signboard to the world. It is one of the most permanent of possessions; it remains when everything else is lost; it is owned by those who possess nothing

else. A name is the only efficient means to describe someone to contemporaries and to posterity. When one dies it is the only part that lives on in the world."

"Surnames originated with the Normans in France in approximately 1,000 A.D." Kennedy–Sjodin, 41 S.D.L.Rev. at 174, citing Pine, The Story of Surnames (1967) 10. "In Post–Conquest England, Norman lords and barons began to grant themselves surnames in order to distinguish themselves from Saxon peasants, who did not use surnames at the time." Id. "In early days, [surnames] were derived from individual reputations, characteristics, occupations, or places of birth and residence and were not passed from generation to generation." Schiffman v. Schiffman (1980), 28 Cal.3d 640, 643, 169 Cal.Rptr. 918, 920, 620 P.2d 579, 581.

"Most scholars agree * * * that the patrilineal system evolved from the medieval property system * * *, [in which] men were the heads of households and owned all property contained in the household, including rights to their wives and children." Kennedy–Sjodin, 41 S.D.L.Rev. at 175. "The trend toward paternal surnames was accelerated by Henry VIII, who required recordation of legitimate births in the name of the father. Thence, the naming of children after the fathers became the custom in England," and the tradition continued in the colonies. Schiffman, 28 Cal.3d at 643, 169 Cal.Rptr. at 920, 620 P.2d at 581. Through the advent of the Married Women's Property Acts, no-fault divorce, and gender-neutral custody statutes, today the rationale for the preference for paternal surname has disappeared. Id.

Changing a child's surname as an incident to divorce is becoming more common as divorce rates continue to remain high in the United States. Kennedy–Sjodin, 41 S.D.L.Rev. at 173. In Ohio, name changes for minors and adults are governed by R.C. 2717.01(A). R.C. 2717.01(B), which governs name changes for minors, provides that "[a]n application for change of name may be made on behalf of a minor by either of the minor's parents * * *. [I]n addition to the notice and proof required pursuant to division (A) of this section, the consent of both living, legal parents of the minor shall be filed, or notice of the hearing shall be given to the parent or parents not consenting * * *."

Further, the standard for deciding whether to permit a name change is "proof that * * * the facts set forth in the application show reasonable and proper cause for changing the name of the applicant." R.C. 2717.01(A).

Because Willhite did not consent, the probate court held a hearing pursuant to R.C. 2717.01(B). At the initial hearing, Williams stated her objectives for changing her daughter's name as giving her daughter the opportunity to grow up identifying with both sides of her family and avoiding the confusion that has resulted from having a mother and daughter in the same household with two different last names. Willhite objected on two grounds. First, he asserted that

the confusion created by having mother and daughter bear different last names was minor, would continue to be minor, and would have very little, if any, adverse effect on the child. Second, he argued that there was no evidence before the court that circumstances had arisen since the divorce that would render it beneficial to the child to receive a name change incorporating her mother's maiden name, which she resumed using after the divorce.

The magistrate noted that since the child's birth, the father had been and continued to be both emotionally and financially supportive of the child, and there was no evidence that he had withdrawn his support in any way since the divorce. In denying the application, the magistrate relied on *In re Newcomb* (1984), 15 Ohio App.3d 107, 15 OBR 198, 472 N.E.2d 1142, which held that "when the father is and has been supporting the child, manifests an abiding interest in the child, is not infamous, has exercised visitation privileges and has promptly objected to the change of name, in the absence of a special and overwhelming reason * * * there does not exist reasonable and proper cause for changing the name of a minor." *Id.* at 110–111, 15 OBR at 201–202, 472 N.E.2d at 1145.

In an entry sustaining the magistrate's decision, the trial judge stated: "It is undisputed that Respondent Guy L. Willhite has been supporting his daughter; has exhibited an interest in her; has shared in his daughter's parenting; and has promptly objected to the change of name." After reviewing this entry, the court of appeals concluded that the decision of the magistrate confirmed that the child's best interest had been considered and that it had been determined that it was not in Elli Willhite's best interest to have her last name modified. We disagree and find that the court of appeals erred as a matter of law by applying only the *Newcomb* test (considering only the father's financial support and visitation) to a petition for a name change, without fully considering the best interest of the child.

Under the *Newcomb* test, as well as tradition, a child's surname has been a sort of quid pro quo for the father's financial support. We find that this ignores the mother's parallel duty to support the child whether or not she is the residential parent. Further, it "reinforce[s] the child-as-chattel mentality by making the child's name a piece of property to be bargained over." Seng, Note, Like Father, Like Child: The Rights of Parents in their Children's Surnames (1984), 70 Va.L.Rev. 1303, 1333–1334; Omi, The Name of the Maiden (1997), 12 Wis.Women's L.J. 253, 293. Indeed, it rewards the father for doing that which he is already legally, if not morally, required to do. Clearly, the notion of equating the best interest of the child with dollars is no longer reasonable in contemporary society.

The courts' reliance on the *Newcomb* standard is too narrowly focused on the father in determining the best interest of the child. In *Bobo v. Jewell* (1988), 38

Ohio St.3d 330, 528 N.E.2d 180, we warned courts against just such a mistake when we cautioned them "to refrain from defining the best-interest-of-the-child test as purporting to give primary or greater weight to the father's interest in having the child bear the paternal surname." *Id.* at 334, 528 N.E.2d at 184–185. Further, we stated that "[i]n these times of parental equality, arguing that the child of unmarried parents should bear the paternal surname based on custom is another way of arguing that it is permissible to discriminate because the discrimination has endured for many years." *Id.* at 334, 528 N.E.2d at 185.

While *Bobo* involved the application of the best-interest-of-the-child test in the context of a paternity action, we find that the same rationale applies here. Further, we conclude that arguing that the child of divorced parents should bear the paternal surname based on custom is similarly objectionable.

R.C. 2717.01(A) requires the court to determine whether the facts set forth in the application show reasonable and proper cause for changing the name of the applicant. We hold that when deciding whether to permit a name change for a minor child pursuant to R.C. 2717.01(A), the trial court must consider the best interest of the child in determining whether reasonable and proper cause has been established.

Further, borrowing from the guidelines in *Bobo* and *In re Change of Name of Andrews* (1990), 235 Neb. 170, 454 N.W.2d 488, we hold that in determining whether a change of a minor's surname is in the best interest of the child, the trial court should consider the following factors: the effect of the change on the preservation and development of the child's relationship with each parent; the identification of the child as part of a family unit; the length of time that the child has used a surname; the preference of the child if the child is of sufficient maturity to express a meaningful preference; whether the child's surname is different from the surname of the child's residential parent; the embarrassment, discomfort, or inconvenience that may result when a child bears a surname different from the residential parent's; parental failure to maintain contact with and support of the child; and any other factor relevant to the child's best interest. *Bobo v. Jewell* (1988), 38 Ohio St.3d 330, 528 N.E.2d 180, paragraph two of the syllabus; *In re Change of Name of Andrews,* 235 Neb. at 177, 454 N.W.2d at 492.

Willhite states that any confusion caused by different surnames of the mother and daughter was the direct result of Williams's decision to revert to her maiden name. Such a notion is absurd as we approach the twenty-first century. A woman has a right to revert to her maiden name, and her decision to do so cannot be used against her. We reject the outdated solution, inherent in Willhite's argument, that a woman should simply keep her married name.

Williams is not attempting to give her daughter a new identity by eliminating the father's name. Rather, Williams is seeking to have both parents' surnames hyphenated and combined as the surname for the daughter the two parties share. Williams is not seeking to distance her ex-husband from their daughter. Instead, she is seeking to foster her daughter's affiliation with both parents, who have different surnames. See In re Change of Name of Andrews, 235 Neb. at 178, 454 N.W.2d at 493. "A dual name would help the child identify with both parents, a state of mind that child psychologists say is essential to the child's adjustment to divorce." Seng, supra, 70 Va.L.Rev. at 1350, citing Cochran & Vitz, Child Protective Divorce Laws: A Response to the Effects of Paternal Separation on Children (1983), 17 Fam.L.Q. 327, 333–334, 353. Further, a combined surname gives the child a greater sense of security. Id.

Equally important, with the name addition, Williams seeks to avoid the confusion so prevalent with having a mother and child in the same household with two different surnames. The addition of the maternal surname may aid in avoiding confusion and embarrassment at school, at the doctor's office, at church, in sports or other social activities, and within the community. The child with a combined surname does not have to explain why his or her last name is different.

A combined surname is a solution that recognizes each parent's legitimate claims and threatens neither parent's rights. The name merely represents the truth that both parents created the child and that both parents have responsibility for that child. Seng, supra, 70 Va.L.Rev. at 1348. Accordingly, we reverse the judgment of the court of appeals and remand the cause to the probate court for disposition consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.