**In re BUDENZ.**

[Cite as *In re Budenz* (1999), 133 Ohio App.3d 359.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 98 CA 38.

Decided April 9, 1999.

*Mary Beth Caudill,* for appellant Cheri Savage on behalf of her minor daughter.

*Lawrence J. Budenz, pro se.*

---

FREDERICK N. YOUNG, Judge.

Appellant Cheri Savage appeals the probate court's denial of her application for a name change filed on behalf of her minor daughter in which Savage sought to change the child's name from Bo Bridgett Budenz to Bo Bridgette Savage. The probate court denied Savage's request as to the child's surname, but granted the requested change in her middle name (adding an "e" at the end). Only the determination respecting the child's surname is at issue on appeal. In light of the Ohio Supreme Court's decision in *In re Willhite* (1999), 85 Ohio St.3d 28, 706 N.E.2d 778, handed down during the pendency of this appeal, we reverse the trial court's judgment.

The record reveals the following facts relevant to the issue before us. Bridgette was born on August 27, 1988, to Savage and her former boyfriend, appellee Lawrence J. Budenz. Bridgette has always resided with her mother, who is the custodial parent. Budenz contributed to the birthing expenses, has exercised regular visitation with his daughter, and has paid child support in the amount of ninety dollars per week since Bridgette's birth. Although Bridgette was given her father's surname at or shortly after her birth, as evidenced by her birth certificate, she was known by her mother's last name until December 20, 1995, when the juvenile court of Montgomery County issued an order requiring the child to begin using her legal surname of Budenz, pursuant to a request by Budenz.

On August 26, 1997, Budenz entered a plea agreement before the Honorable Judge Walter Rice in the United States District Court for the Southern District of Ohio in which he pled guilty to one count of wire fraud and one count of tax evasion. The plea agreement was in connection with a scheme in which Budenz is alleged to have relieved several clients of his accounting firm of more than two million dollars that he then, at least in part, sent or took to one or more Las Vegas casinos for the purpose of gambling. It is our understanding that Budenz was eventually incarcerated for a term unknown to us as a result of these acts. Budenz's criminal activity was noted in the news media. Fearful that Bridgette would hear of her father's misdeeds from other sources and preferring that the child receive such news in a safe environment, Savage explained Budenz's legal trouble to Bridgette, who reacted with predictable and understandable embarrassment.

After Budenz's convictions, Savage applied to the probate court in Clark County for change of name as noted above. Budenz promptly objected and a hearing was held on March 4, 1998, at which time Savage and Budenz called witnesses and presented evidence.

Savage testified to the troubled nature of her and Budenz's relationship and the turmoil surrounding Bridgette's birth and naming. She explained that in 1995, the parties and Bridgette underwent psychological evaluation by Dr. Kuehnl, whose recommendation the juvenile court in Montgomery County relied upon when determining that it would be in Bridgette's best interests to use her father's surname. According to Savage, Dr. Kuehnl stated in her report that she was of the opinion that Bridgette's use of the Budenz name would help to foster a closer relationship between Bridgette and her father. Savage testified that forcing Bridgette to use Budenz's name, in conjunction with the pre-existing difficulties in the relationship between Bridgette and her father, and the child's embarrassment over her father's criminal activities, have had an effect opposite from the one predicted by Dr. Kuehnl. Bridgette's distress has elevated to the point of interfering with her physical health. She now suffers from an esophageal and stomach reflux condition, severe headaches, and aching arms and legs, all apparently caused by stress. Bridgette frequently misses school because of these physical ailments and was, at the time of the hearing, receiving medical treatment for them.

Savage also testified that Bridgette's social security card, library card, and baptismal certificate all reflect the name Savage, as did her school records up until 1995. In addition, Bridgette refused to appear in her school's yearbook under the name Budenz. Savage acknowledged that none of her other relatives possess the last name of Savage and that on at least one occasion Bridgette accompanied her father to a Budenz family reunion, an event that is repeated every other year.

Cynthia Levy, a psychologist who has treated Bridgette since she was about three years old, also testified. She stated that Bridgette has expressed to her a fear of Budenz as well as a dislike of him. Dr. Levy testified that Bridgette began feeling distressed over using the Budenz name in the second grade. In addition to refusing to appear in the yearbook under "Budenz," Bridgette would not write her last name on her papers. In the 1997–1998 school year, Dr. Levy noticed a "serious downturn" in Bridgette's mental health that was evidenced by hysteria, anger, and increased distress over visitation with her father. The onset of these problems coincided with Budenz's convictions and the news media's focus on them.

Dr. Levy testified that Bridgette has relationships with several members of her extended family on her mother's side, but has only mentioned her grandmother,

Budenz's mother, on her father's side. Dr. Levy supported Bridgette's desire to resume use of Savage's last name because she felt it would provide Bridgette with a feeling that she had some measure of control in her life. On the other hand, forcing Bridgette to use Budenz's name would result in feelings of hopelessness in the child. In addition, Dr. Levy stated the requested name change, if granted, would neither hinder nor help Bridgette's relationship with her father because the relationship itself is problematic apart from the name-change issue.

Budenz also testified. He recounted the events surrounding Bridgette's birth and naming, although in a somewhat different light than did Savage. He also acknowledged his convictions for wire fraud and tax evasion and that his misdeeds drew the attention of the news media. In the remainder of his testimony, Budenz alleged incidents of his abuse at the hands of Savage and described disputes he and Savage have had in the past over visitation, support, and telephone contact between both parents and Bridgette, none of which is germane to the issue at hand.

On March 26, 1998, the probate judge issued his decision and entry allowing the addition of the final "e" to Bridgette's middle name, but denying Savage's request to change the child's last name from Budenz to Savage. Savage filed a timely notice of appeal and now presents one assignment of error for our review:

"The trial court abused its discretion in failing to find that reasonable and proper cause existed for the surname change, particularly in failing to consider other revelant [sic] factors in the child's best interests as warranting the name change."

In Ohio, name changes for minors are governed by R.C. 2717.01(B), which provides that "[a]n application for change of name may be made on behalf of a minor by either of the minor's parents." Consent of both living parents must be filed, or, if either parent does not consent, he or she is entitled to notice and a hearing to determine whether the "facts set forth in the application show reasonable and proper cause for changing the name of the [minor child]." R.C. 2717.01(A). We reverse a probate court's determination of whether a proposed name change is in a child's best interest only if it constitutes an abuse of discretion. *In re Crisafi* (1995), 104 Ohio App.3d 577, 581, 662 N.E.2d 887, 890.

Before continuing on to the merits of Savage's assignment of error, it must be noted that on March 17, 1999, while this case was pending before us, the Ohio Supreme Court rendered its opinion in *In re Willhite* (1999), 85 Ohio St.3d 28, 706 N.E.2d 778. We are cognizant of the fact that the probate court did not have the advantage of the Supreme Court's reasoning in *Willhite* when it denied the name change requested in the case *sub judice*. Nevertheless, the *Willhite*

decision is binding upon us now, and it must be our guide as we consider the issue before us in this case. A brief review of the relevant case law is helpful.

In *Willhite*, the trial court relied on the Tenth District Court of Appeals' opinion in *In re Newcomb* (1984), 15 Ohio App.3d 107, 15 OBR 198, 472 N.E.2d 1142, in which the court set forth the factors to be considered in cases where a name change is requested for a minor child as follows:

"When the father is supporting the child, manifests an abiding interest in the child, is not infamous, has exercised visitation privileges and has promptly objected to the change of name, the applicant must present a special and overwhelming reason indicating that the change of name would be in the best interest of the child, in order to satisfy the R.C. 2717.01 requirement 'that there exists reasonable and proper cause for changing the name.'" *Id.*, paragraph two of the syllabus.

A few years after *Newcomb*, the Supreme Court of Ohio expounded on the factors to be considered in situations where the never-married parents of a child disagree on which of their names the child will carry. The court stated:

"[T]he court should consider: the length of time that the child has used a surname, the effect of a name change on the father-child relationship and on the mother-child relationship, the identification of the child as part of a family unit, the embarrassment, discomfort or inconvenience that may result when a child bears a surname different from the custodial parent's, the preference of the child if the child is of an age and maturity to express a meaningful preference and any other factor relevant to the child's best interest. [The court] should consider only those factors present in the particular circumstances of each case." *Bobo v. Jewell* (1988), 38 Ohio St.3d 330, 528 N.E.2d 180, paragraph two of the syllabus.

Although *Bobo* involved the application of the best-interest-of-the-child test in the paternity context, some courts of appeals, including this one, have held the factors identified therein to be equally applicable to contested name change petitions brought pursuant to R.C. 2717.01. *E.g., In re Morton* (Nov. 20, 1998), Greene App. No. 98 CA 14, unreported, 1998 WL 801376. This view was adopted by the Ohio Supreme Court in *Willhite*, 85 Ohio St.3d at 32, 706 N.E.2d at 782.

*Bobo* has been the preeminent case concerning name changes for minor children. On March 17, 1999, however, the Ohio Supreme Court issued its opinion in *Willhite*. There, a mother sought to have her daughter's surname hyphenated to include her own maiden name after she had resumed using her maiden name following her divorce from the child's father. The mother's stated reasons for desiring the name change for her daughter were to give the child an opportunity to grow up identifying with both sides of her family and to avoid any confusion from the child's name not including the mother's surname. *Id.*, 85 Ohio

St.3d at 30, 706 N.E.2d at 781. The trial court denied the name change request based on *Newcomb* without taking into consideration the factors enumerated in *Bobo*. The court of appeals affirmed. The Supreme Court reversed, finding the trial court's reliance on *Newcomb*, which perpetuated the traditional arrangement that the child carry the father's name as *quid pro quo* for the father's financial support, was outdated and too narrowly focused on the father in determining the best interest of the child. *Willhite*, 85 Ohio St.3d at 31–32, 706 N.E.2d at 781–782.

Of significance to the present case, the court restated the *Bobo* factors in *Willhite* and added two new factors (italicized below):

"[I]n determining whether a change of a minor's surname is in the best interest of the child, the trial court should consider the following factors: the effect of the change on the preservation and development of the child's relationship with each parent; the identification of the child as part of a family unit; the length of time that the child has used a surname; the preference of the child if the child is of sufficient maturity to express a meaningful preference; *whether the child's surname is different from the surname of the child's residential parent;* the embarrassment, discomfort, or inconvenience that may result when a child bears a surname different from the residential parent's; *parental failure to maintain contact with and support of the child;* and any other factor relevant to the child's best interest." (Emphasis added and citations omitted.) *Willhite*, 85 Ohio St.3d at 32, 706 N.E.2d at 782.

In this revised articulation of the relevant factors in name-change cases involving minors, the Ohio Supreme Court corrected *Newcomb*'s disproportionate attention to the father's traditional entitlement to have his child carry his name in exchange for his financial support. *Id.* at 31–32, 706 N.E.2d at 781. In doing so, the court incorporated into the new set of factors those portions of the *Newcomb* test pertinent to determining the best interest of the child that treated both parents equally, and the rest of the test was jettisoned. Further, the court determined that the fact that the child's name is different from that of the residential parent is itself a factor in determining the child's best interest and that it was to be considered in addition to any embarrassment, discomfort, or inconvenience that may flow from the child having the different name. We now proceed to apply the law as it is stated in *Willhite* to the facts at hand.

The first of the *Willhite* factors requires a court to consider the effect of the proposed name change on the preservation and development of the child's relationship with each parent. Dr. Levy testified, and the probate court found, that changing Bridgette's name to Savage would have no appreciable effect on either relationship.

Next, the identification of the child as part of a family unit is taken into account. Although Bridgette was not called as a witness, both her mother and Dr. Levy testified that Bridgette considers herself to be a Savage and that she resents having to use the Budenz surname. At school, Bridgette refuses to write her last name on her papers, and she preferred to be excluded from the school yearbook rather than appear there under the name of Budenz. No such problems attended her use of the name Savage. In addition, Dr. Levy testified that Bridgette has often talked about her extended family on her mother's side, but has mentioned only one relative on her father's side, that being her grandmother, Budenz's mother. Savage stated, however, that Bridgette has accompanied her father to the biennial Budenz family reunions on an unspecified number of occasions. Budenz did not dispute that Bridgette is more involved with her maternal relatives. Instead, he cross-examined Dr. Levy and elicited from her the bare fact that geographic proximity fosters relationships. The probate court found that Bridgette has a good relationship with her maternal relatives and did not remark upon her relationship with her paternal relatives.

As for the third of the *Willhite* factors (the length of time the child has used a surname), the probate court only indirectly considered the length of time Bridgette had used the names Savage and Budenz by stating that the present problems could have been avoided by Savage's use of the Budenz name for Bridgette from the time of her birth. The same may be said, however, of Budenz with regard to the use of Savage's name for Bridgette. In other words, either party could have avoided the current debate over which name should be used by permitting use of the name to which he or she now objects. We presume, however, that since culpability of either party is not a relevant factor in determining the best interest of the child, the probate court's comment was made in the way of observation and was not articulated as a basis for its decision. The record does show that Bridgette used Savage's last name from birth to age seven, and that she was required to use Budenz's name from that time to the present, a period of approximately three and one-half years. Thus, Bridgette has used her mother's surname for twice the period of time she has used her father's surname.

The next *Willhite* factor requires a trial court to consider the child's preference in a name-change petition, if the child is of an age and maturity to express a meaningful preference. As was noted above, Bridgette did not testify at the hearing. A conclusion as to her preference can nevertheless be drawn from the testimony of Savage and Dr. Levy, who both described Bridgette's adamant refusal to use Budenz's name at school. As a ten-year-old, Bridgette's preference should be given serious consideration. Since the probate court did not interview Bridgette, however, and in the resulting absence of any determination by the court that Bridgette possesses sufficient maturity to make a meaningful choice as

to which name she wants to use, we are reluctant to hold that her preference, as communicated by Savage and Dr. Levy, should have carried an undue amount of weight in the court's analysis. Nevertheless, from the court's finding that Bridgette suffers discomfort from the use of her father's name, it can be inferred that her preference would be for the name Savage.

Under the fifth *Willhite* factor a court must consider whether the child's surname is different from that of the residential parent. Here, Savage, who is the residential parent, is seeking to have Bridgette's name changed so that they will share the same name. Budenz has never been Bridgette's residential parent.

The sixth factor in *Willhite* requires the trial court to consider the discomfort or inconvenience that may result when a child bears a surname different from the custodial parent's surname. The probate court acknowledged that Bridgette "does suffer discomfort from the use of the father's surname," and, while the court went on to conclude that allowing the name change would have little effect on her discomfort, neither the *Bobo* factors nor their successors in *Willhite* direct the court to consider the ameliorative effect of the proposed name change. A court is required to consider any embarrassment, discomfort, or inconvenience that may result from the child having a surname different from that of the residential parent. Here, the probate court found actual discomfort did result.

Furthermore, although Savage and Dr. Levy both testified to the effect that Bridgette was always reluctant to use the Budenz name, her discomfort increased dramatically when Budenz's criminal activities and subsequent convictions came to light in the news media. Savage testified that Bridgette's initial reaction upon learning of her father's convictions was embarrassment, which was followed by physical manifestations of her stress shortly after her father's misdeeds became publicly known. Dr. Levy also noticed a "serious downturn" in Bridgette's demeanor at about that same time, resulting in Dr. Levy's revision of her diagnosis for Bridgette from an adjustment disorder to recurrent depression. Dr. Levy's diagnosis and explanation for Bridgette's distress was not challenged at the hearing and nothing in the record suggests there was any reason for Bridgette's physical and mental deterioration other than as was testified to by Dr. Levy. The probate court acknowledged the serious nature of Budenz's crimes but found it insufficient, alone or in conjunction with the court's other conclusions, to prove it was reasonable and proper to cause a change of Bridgette's surname under prevailing law.

The seventh *Willhite* factor directs a trial court to consider whether either parent has failed to maintain contact with and support of the child. Budenz has regularly exercised his visitation with Bridgette and has paid his child support obligation since shortly after her birth.

The eighth and final factor is the catch-all consideration of any other relevant factor. The probate court apparently found none, nor do we.

 We note that Budenz's arguments in his *pro se* brief to this court add nothing to our analysis. First, he urges us to dismiss Savage's appeal due to what appears to be a typographical error in her citation to the Revised Code. We cannot endorse such a harsh result · and we observe that in all other documents the correct code section was cited. He then argues the factual issue of whether Bridgette used the Savage name prior to the 1995 court order requiring her to use Budenz. Surely this issue was presented to and settled by the juvenile court in Budenz's 1995 action, which resulted in Savage being ordered to use the Budenz name for Bridgette. If so, it is *res judicata;* if not, it has been waived and is consequently a non-issue before this court. Budenz also disputes whether the funds he allegedly stole from his accounting firm's clients should be considered for purposes of calculating child support and the circumstances of his arrest and convictions. Aside from their irrelevance, the facts Budenz relies on in making his arguments were not before the probate court and are therefore not properly to be considered on appeal. Budenz then introduces numerous additional items of questionable evidentiary value that he similarly failed to bring forth at the hearing. These, too, are excluded from our consideration since we are confined to the record before us.

 Under *Bobo*, and, to a lesser extent, *Newcomb*, this case would be extremely close. As a result of *Willhite*, however, the scale is tipped, and we conclude that we must reverse the probate court's decision denying the name change Savage requested for Bridgette. Although the mother in *Willhite* was seeking only that her child's name be hyphenated to include her surname, we do not find that difference to be dispositive here, especially when it is remembered that the mother's objectives in seeking the name change in *Willhite* were to provide her daughter an opportunity to identify with both sides of her family and to avoid the confusion that might result from the child carrying a surname that did not include the mother's surname. Here, many more serious reasons exist for Bridgette's name change to be granted. Foremost, Bridgette's physical and emotional health have been detrimentally affected by the stress and anxiety she experiences over having to use the name Budenz. The embarrassment and discomfort she feels, as a result of using her father's surname since his convictions, is great enough to cause her to choose not to appear in the school yearbook under that name and to refuse to write the name Budenz on her schoolwork. In addition, Bridgette interacts and identifies with her maternal relatives more than she does with her paternal relatives; Bridgette was known by the name Savage twice as long as she has been known as a Budenz; the name change would allow her to share the name of her residential parent, Savage; and the name change

would neither interfere with nor stunt the development or preservation of Bridgette's relationship with either parent.

We find that under *Willhite*, the trial court's determination that changing Bridgette's surname from Budenz to Savage was not in her best interest constitutes an abuse of discretion. Accordingly, Savage's assignment of error is sustained.

The decision and entry of the probate court is reversed, and the cause is remanded for the entry of a final judgment granting the change of Bridgette's surname from Budenz to Savage.

*Judgment reversed*
*and cause remanded.*

BROGAN and WOLFF, JJ., concur.