[Cite as *In re H.C.W.*, 2019-Ohio-757.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN THE MATTER OF:          :
CHANGE OF NAME OF                              CASE NO.   CA2018-07-069
                           :
          H.C.W.                                 O P I N I O N
                           :                       3/4/2019


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. 2018-9073


Joshua R. Langdon, 810 Sycamore Street, Cincinnati, Ohio 45202, for appellant


**M. POWELL, J.**

{¶ 1}   Applicant-appellant, S.L.W., appeals a decision of the Warren County Court of Common Pleas, Probate Division, denying her application for a name change for her minor child.

{¶ 2}   S.L.W. ("Mother") and K.W. ("Father") are the parents of H.C.W.  On April 24, 2018, Mother filed an application to change her child's name from H.C.W., the child's female birth name, to E.J.W., a male name.[1]  Mother requested the name change because "the child picked name to suit gender identity."  The application was accompanied by consents from both Mother and Father.  A hearing on the application was held before the probate court on June 18, 2018.  During the hearing, the parents and H.C.W. appeared, and all testified under

---

1. In this opinion, the child will be referred to as H.W.C., the child's current legal name; however, male pronouns will be used in accordance with his preferred gender identity.

oath in a freewheeling discussion with the probate judge.[2]

{¶ 3} H.C.W. was 15 years old at the time of the hearing and attended a public high school. H.C.W. expressed to the probate court that he had experienced a "feeling of distress * * * from as far back as I can remember" which he could not attribute to anything in particular. But upon learning he could be transgender, "it kind of clicked, and you know * * * that's what I was upset * * * about. That I wanted to be a boy, but I couldn't." Sometime after this revelation and approximately a year prior to the hearing, H.C.W. informed his parents. About this same time, H.C.W. began presenting himself as an adolescent boy by sporting a male haircut and wearing masculine clothing. H.C.W. also spoke with his school counselor about the issue. Thereafter, and beginning with the last school year completed prior to the hearing, teachers at school referred to him by his preferred male name of E.J.W. H.C.W. is also referred to by his family as E.J.W.

{¶ 4} Upon being informed by H.C.W. that he wanted to be a boy, his parents were concerned about whether his desire to be a boy "was real" and not "a trend or a fad" or a "passing phase." The probate court inquired whether H.C.W. had friends in school that were dealing with gender identity issues, presumably to explore whether H.C.W.'s preference for the name change was the result of peer pressure or similar influences. H.C.W replied that he knew of maybe three other students that had gender identity issues, but that they were just "acquaintances."

{¶ 5} Father noted that before they sent H.C.W. to a therapist, H.C.W. displayed anxiety and was using anti-depressants. Consequently, H.C.W.'s parents engaged a therapist to counsel with H.C.W. concerning these various issues. The first therapist recommended that they see another therapist who specializes in transgender issues. Based

---

2. Although the probate court's judgment entry reflects that only Mother and the child testified, the transcript of the hearing reflects that Father appeared and testified.

upon that recommendation, H.C.W. began counseling with Marcy Marklay at the Lindner Center. H.C.W. was subsequently diagnosed with gender dysphoria.[3]

{¶ 6} At the time of the hearing, H.C.W. had completed approximately 20 hour-long sessions with Marklay. The parents intend to continue H.C.W.'s counseling with Marklay for as long as recommended. Father provided the probate court with a letter from Marklay releasing H.C.W. for male hormone therapy.[4]

{¶ 7} The parents and H.C.W. have had four consultations with Dr. Conard at Children's Hospital concerning testosterone therapy. Based upon these consultations, the parents understand that mental health outcomes are better the earlier hormone therapy is begun. The parents and H.C.W. also understand that testosterone therapy would result in several physical changes, including facial hair, male Adam's apple, and voice change. Essentially, testosterone therapy would result in H.C.W. experiencing male puberty. Although hormone therapy is a lifelong treatment, some of the changes resulting from the therapy are permanent. As of the date of the hearing, H.C.W. had provided a blood sample to the hospital to establish his baseline hormone levels. Mother told the probate court that beginning hormone therapy was not "something that we are treating lightly" and that after "a lot of discussion about it" the testosterone therapy was scheduled to begin about a month after the hearing date.

{¶ 8} The probate court confirmed that H.C.W. understood that he had a common law right to "go by whatever name you want to," and questioned "[w]ho won't agree to that?" and "what's the need to have it done legally?" H.C.W. replied that while he is referred to as

---

3. Gender dysphoria is defined as "[a] marked incongruence between one's experienced/expressed gender and assigned gender[.]" American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 451-453 (5th Ed.2013). The medical condition "is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning." *Id.*

4. The record reflects the gist of the Marklay letter, however, the letter itself was not admitted into evidence.

E.J.W. at school, the school's official records reflect his name as H.C.W. Thus, substitute teachers refer to him by the female name reflected in his school records, causing him distress. H.C.W. also stated that other legal documents and his prescriptions refer to him as H.C.W. Father addressed this issue and advised the probate court that

> [E.J.W.] is fifteen (15), soon will be fifteen and a half (15 1/2 ), and we'll be applying for driver's permits, and, then driver's license, and, then eventually passports, and, college, and, um, for this I, I practically wanted the name changed to happen if that's what he wants. Um, for my insurance uh, again for college applications, uh, for emergency situations, and, things I wanted him uh, to be legally known as [E.J.W.]. And, that's why we're going through this process.

{¶ 9} Based upon their consultations with therapists and Dr. Conard and extensive discussion among the three of them, the parents were convinced that the name change was in H.C.W.'s best interest. As Mother stated, "we have been going to therapy for about a year now, and * * * we've been to Children's Hospital and * * * gone through all of the * * * things that we feel like we should go through, and, we're convinced that it's in [E.J.W.'s] best interest to change his name."

{¶ 10} The probate court took the matter under advisement. By judgment entry filed on June 22, 2018, the probate court denied the name change, finding it was not "reasonable and proper and in the child's best interest at this time." In so holding, the probate court cited the best interest factors applicable to name change for minors set forth in *In re Willhite*, 85 Ohio St.3d 28 (1999), and *Bobo v. Jewel*, 38 Ohio St. 3d 330 (1988).

{¶ 11} In denying the name change, the probate court focused upon H.C.W.'s youth and noted that "[a] name change request today by a child could be motivated by short-term desires or beliefs that may change over the passage of time as the child matures. The Court recognizes the reality that [H.C.W.'s] brain is still growing and changing and is simply not ready to make this life-altering decision." The probate court stated that it was not saying "no"

- 4 -

to the name change but was simply saying "not yet" to give H.C.W. the time to "Age," "Develop," and "Mature." The probate court reiterated that the child could exercise his "common-law right to use the name [E.J.W]" and reapply for a name change upon becoming an adult.

{¶ 12} Mother now appeals the probate court's denial of the name change application, raising three assignments of error.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S APPLICATION FOR CHANGE OF NAME OF MINOR BECAUSE THE DENIAL WAS ARBITRARY, UNREASONABLE, UNCONSCIONABLE, AND BASED SOLELY UPON THE TRANSGENDER STATUS OF APPLICANT'S CHILD.

{¶ 15} "It is universally recognized that a person may adopt any name he may choose so long as such change is not made for fraudulent purposes." *Pierce v. Brushart*, 153 Ohio St. 372, 380 (1950). "In Ohio, names may be changed either by resorting to a judicial proceeding or by the common-law method of simply adopting a new name, so long as the change is not made for fraudulent purposes." *Bobo*, 38 Ohio St.3d at 333.

{¶ 16} The general procedure for a statutory name change is set forth in R.C. 2717.01(A). The statute requires that the applicant have been a resident of the county for at least a year immediately prior to the filing of the application, and that the application set forth both the reason for the name change and the requested new name. Publication in a newspaper of general circulation is required for at least 30 days prior to the hearing on the application. The probate court may grant the application upon proof of a "reasonable and proper cause" for the name change.

{¶ 17} R.C. 2717.01(B) governs name changes for minors. The procedure for changing the name of a minor is the same as that set forth in R.C. 2717.01(A), with the

exception that the application be filed by the "parents, a legal guardian, or a guardian ad litem" of the minor, and that the application be accompanied by the minor's parents' consent to the name change or that notice of the hearing be given to any non-consenting parent. The standard for deciding whether to permit a name change for a minor pursuant to R.C. 2717.01(B) remains "proof that * * * the facts set forth in the application show reasonable and proper cause for changing the name of the applicant." R.C. 2717.01(A); *In re Willhite*, 85 Ohio St. 3d at 30.

{¶ 18} R.C. 2717.01(C) sets forth certain factors disqualifying a person from obtaining a name change. None of the factors are applicable. Pursuant to R.C. 2717.01(B), Mother had the right to request the name change for H.C.W., Mother and Father each consented to the name change, and notice is not otherwise an issue in this case. H.C.W. is therefore eligible to have his name changed and all procedural requisites of R.C. 2717.01 have been satisfied. Thus, the sole issue before the probate court concerned whether Mother sought the name for a "reasonable and proper cause."

{¶ 19} "[W]hen deciding whether to permit a name change for a minor child pursuant to R.C. 2717.[01], the trial court must consider the best interest of the child in determining whether reasonable and proper cause has been established." *In re Willhite*, 85 Ohio St.3d at 32. This necessarily involves a broader inquiry than that applicable to an adult name change. We will only reverse a probate court's determination of whether a proposed name change is in a child's best interest if it constitutes an abuse of discretion. *In re Crisafi*, 104 Ohio App. 3d 577, 581 (8th Dist.1995). An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 20} In *Bobo*, the Ohio Supreme Court first recognized several factors courts should consider in determining whether a name change serves a child's best interest. The supreme

court revisited the issue in *In re Willhite*, and with the addition of two factors, reaffirmed the *Bobo* factors. Since *In re Willhite*, the best interest factors are as follows:

> [T]he effect of the change on the preservation and development of the child's relationship with each parent; the identification of the child as part of a family unit; the length of time that the child has used a surname; the preference of the child if the child is of sufficient maturity to express a meaningful preference; whether the child's surname is different from the surname of the child's residential parent; the embarrassment, discomfort, or inconvenience that may result when a child bears a surname different from the residential parent's; parental failure to maintain contact with and support of the child; and any other factor relevant to the child's best interest.

*In re Willhite*, 85 Ohio St.3d at 32.

{¶ 21} The *Bobo/Willhite* best interest factors were adopted by the supreme court to assist courts in "determining the best interest of the child concerning the surname to be used when parents who have never been married contest a surname." *Bobo*, 38 Ohio St.3d at 334-335. *Bobo* and *Willhite* each involved surname changes for children whose parents were not married to each other, maintained separate households, and disagreed as to whether the child's surname name should be changed. In other words, the enumerated *Bobo/Willhite* best interest factors applied where family/parental identification issues were implicated by a name change. This case does not involve family/parental identification issues and differs from *Bobo* and *Willhite* in other significant respects. Specifically, this case involves a name change to promote the child's gender identity and is sought by an intact family in which both parents have consented to the name change and agree that it serves the child's best interest. Thus, many of the enumerated *Bobo/Willhite* best interest factors are ill-suited to a name change such as this and other best interest factors must be considered.

{¶ 22} As of this writing, there are no reported Ohio opinions addressing specific and appropriate best interest factors applicable to gender name changes for transgender minors. Mother directs our attention to *Sacklow v. Betts*, 450 N.J.Super. 425, 163 A.3d 367 (2017), in

which the New Jersey Superior Court considered a name change consistent with a transgender child's gender identity. The superior court stated

> [T]he court finds that the best interest of the child standard should govern the court's decision and that the following factors should be considered when determining whether a name change is in the minor child's best interest, where the minor child is transgender and wishes to assume a name they believe corresponds to the gender they identify with: (1) The age of the child; (2) The length of time the child has used the preferred name; (3) Any potential anxiety, embarrassment or discomfort that may result from the child having a name he or she believes does not match his or her outward appearance and gender identity; (4) The history of any medical or mental health counseling the child has received; (5) The name the child is known by in his or her family, school and community; (6) The child's preference and motivations for seeking the name change; (7) Whether both parents consent to the name change, and if consent is not given, the reason for withholding consent.

*Id.* at 427.

{¶ 23} We believe the *Sacklow* factors, with minor modification, are appropriate best interest factors to be considered in a case such as this, pursuant to the *Bobo/Willhite* "any other factor relevant to the child's best interest." Thus, in considering a gender name change for a transgender child, the factors a court should consider in determining whether the name change serves the child's best interest, in addition to the relevant, enumerated *Bobo/Willhite* factors, shall include (1) the age of the child; (2) the child's motivations regarding the name change; (3) the length of time the child has used the preferred name; (4) any potential anxiety, embarrassment, or discomfort that may result from the child having a name he or she believes does not match his or her outward appearance and gender identity; (5) the history of any medical or mental health counseling the child and parents have received; (6) the name the child is known by in his or her family, school, and community; and (7) the wishes and concerns of the child's parents.

{¶ 24} In denying the name change application, the probate court relied primarily upon

H.C.W.'s maturity to express a meaningful preference to change his name to E.J.W. The probate court denied Mother's application based upon its assessment that H.C.W. "is simply not ready to make this life-altering decision." The probate court incorrectly characterized its consideration of Mother's application as being "faced with a request from a 15-year-old who lacks the age, maturity, knowledge, and stability to make this decision." The probate court's fixation upon H.C.W.'s maturity to express a meaningful preference resulted in its failure to consider other significant factors relating to H.C.W.'s best interest.

{¶ 25} First, the probate court failed to recognize that it was H.C.W.'s mother, and not H.C.W., who sought the name change. In doing so, the probate court neglected to consider the preferences of H.C.W.'s parents and their assessment of H.C.W.'s best interest. In a plurality opinion, the United States Supreme Court recognized that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel v. Granville*, 530 U.S. 57, 68-69, 120 S.Ct. 2054 (2000). The Supreme Court further stated, "if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* at 70. In 2005, the Ohio Supreme Court adopted the plurality view expressed in *Troxel* and held that "Ohio courts are obligated to afford some special weight to the wishes of parents of minor children when considering petitions for nonparental visitation." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, ¶ 12.

{¶ 26} However, the presumption that fit parents act in the best interest of their children is not unlimited:

> [The] presumption that fit parents act in the best interest of their children * * * is [not] irrefutable. The trial court's analysis of the best interests of a child need not end once a parent has

articulated his or her wishes. By stating in *Troxel* that a trial court must accord at least some special weight to the parent's wishes, the United States Supreme Court plurality did not declare that factor to be the sole determinant of the child's best interest. Moreover, nothing in *Troxel* suggests that a parent's wishes should be placed before a child's best interest.

*Id.* at ¶ 44.

**{¶ 27}** Although *Troxel* and *Collier* involved non-parental visitation with a child, those cases were broadly based upon the fundamental right of parents to make decisions concerning the care, custody, and control of their children as guaranteed by the Due Process Clause of the Fourteenth Amendment.[5] Just as a court order respecting who may visit with a child touches upon the fundamental, constitutional right of a parent to the care, custody, and control of his or her child, so does a court order respecting the name by which the child shall be known. Thus, H.C.W.'s parents' preference for the name change and their determination that it serves H.C.W.'s best interest should have been considered by the probate court and accorded some special weight.

**{¶ 28}** Instead of giving "some special weight" to H.C.W.'s parents' preferences regarding the name change, the probate court summarily dismissed them. In its sole reference to the parents' preferences, the probate court discounted them as simply a "desire to assuage their child." However, in contrast to "assuaging" H.C.W.'s preference to change his name, the record plainly shows that the parents engaged a therapist specializing in transgender issues, kept H.C.W. in therapy for a year, consulted with the therapist, consulted with Dr. Conard of Children's Hospital concerning testosterone therapy, associated with a support group, and had extensive discussions among themselves before seeking the name

---

5. The concurring opinion seeks to distinguish *Collier* from the instant case on the ground it involved R.C. 3109.051(D)(15), which provides for consideration of parental wishes and concerns, whereas there is no similar statute here. However, it is clear from *Troxel* and *Collier* that the source of a parent's fundamental liberty interest in the care and custody of the parent's children is the Due Process Clause of the Fourteenth Amendment to the United States Constitution, not a state's statutes. *Troxel* and *Collier* apply when, as in this case, a court intervenes "into the private realm of the family."

- 10 -

change. The parents undertook efforts to satisfy themselves that H.C.W.'s feelings about his gender identity were "real," and based upon all of the foregoing, were satisfied that H.C.W. did not want the name change as part of a "fad," "trend," or "passing phase." The probate court erred in failing to consider the parents' assessment of H.C.W.'s best interest and accord that assessment some special weight when it ruled upon the name change application.

{¶ 29} The probate court's discussion in the "Decision" section of its judgment entry does not reveal any consideration of H.C.W.'s mental health counseling and his upcoming testosterone therapy. The probate court discounted this evidence, speculating that "[w]hether [H.C.W.] is experiencing Gender Dysphoria or is just not comfortable with her body is something that only time will reveal. Is [H.C.W.'s] distress brought about by confusion, peer pressure, or other non-transgender issues - or is it truly a mismatch between her gender identity and her body?" However, the uncontroverted evidence revealed that H.C.W. has counseled with his transgender therapist approximately 20 times in hour-long sessions as of the time of the name change hearing. H.C.W. was diagnosed with gender dysphoria. Based upon those sessions, H.C.W.'s therapist released H.C.W. for testosterone therapy. Preliminary testing has been completed and testosterone therapy, which will result in some permanent physical changes, was scheduled to begin just a few weeks after the hearing. These actions of mental health and medical professionals legitimize and corroborate H.C.W.'s parents' assessment that H.C.W.'s feelings about his gender identity are not a "fad," "trend," or "passing phase," but are "real."

{¶ 30} The probate court further overlooked the practical aspects of H.C.W.'s male gender identity. In the year preceding the hearing, H.C.W. has presented himself as an adolescent boy, sporting a male haircut and wearing masculine clothing. H.C.W. has been known at school and by his family as E.J.W., his preferred male name. H.C.W. experiences

distress when referred to by his female birth name by persons relying upon his official records. The timing of the name change is in part motivated by the need to have H.C.W.'s driver's license, passport, college applications, and similar documents reflect a name consistent with his male gender identity. Finally, unlike the permanent physical changes H.C.W. will experience from testosterone therapy, if the probate court's expressed concerns are borne out, the name change is reversible. All of the foregoing are important considerations in the determination of whether the name change promotes H.C.W.'s best interest.

{¶ 31} Considering all of the foregoing, we find that the probate court abused its discretion by failing to consider appropriate best interest factors before it denied the name change application.

{¶ 32} Mother's first assignment of error is sustained.

{¶ 33} Assignment of Error No. 2:

{¶ 34} THE TRIAL COURT ERRED IN DENYING APPELLANT'S APPLICATION FOR CHANGE OF NAME OF MINOR BECAUSE THE DENIAL INFRINGED UPON THE FOURTEENTH AMENDMENT'S SUBSTANTIVE DUE PROCESS CLAUSE.

{¶ 35} Assignment of Error No. 3:

{¶ 36} THE TRIAL COURT ERRED IN DENYING APPELLANT'S APPLICATION FOR CHANGE OF NAME OF MINOR BECAUSE THE DENIAL INFRINGED UPON THE FIRST AMENDMENT'S FREE SPEECH CLAUSE.

{¶ 37} In her second and third assignments of error, Mother argues that the probate court's denial of the name change application violated the parents' substantive due process right to the care, custody, and control of their child and violated H.C.W.'s rights under the First Amendment of the United States Constitution. Based upon our resolution of the first assignment of error, these assignments of error are rendered moot.

{¶ 38} We hereby reverse the probate court's denial of the name change application and remand the matter to the probate court to reconsider the application for change of name pursuant to the best interest factors recognized herein and based upon the record or after such further proceedings as the probate court deems necessary.

{¶ 39} Judgment reversed and cause remanded.

RINGLAND and PIPER, JJ., concur.

**PIPER, J., concurring separately.**

{¶ 40} I concur with the reversal of the probate court's decision. However, I would not remand, but would instead enter judgment as a matter of law pursuant to App.R. 12(B). I write separately because the rationale of my colleagues is both unnecessary and inappropriately applied. We need only examine the record as it exists to determine the testimony demonstrates the requested name change application established a reasonable and proper cause and was in the young person's best interest. R.C. 2717.01.

{¶ 41} The majority sua sponte argues that "parental preferences" must be given "special weight," citing *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334. Substantive due process is also sua sponte raised and incorporated into the mix by the majority to impose their rationale upon a probate court name change proceeding, citing *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054 (2000).

{¶ 42} Unfortunately, the majority misinterprets and then misapplies *Collier*. In *Collier*, the Ohio Supreme Court analyzed *specific statutes* that pertain to non-parental visitation rights. In doing so, the Ohio Supreme court found that, "in fact, special weight is required by R.C. 3109.051(D)(15), since the statute *explicitly identifies* the parents' wishes regarding the requested visitation * * * as a factor that must be considered * * *." (Emphasis added). *Id.* at

¶ 43.

**{¶ 43}** There are no statutes in a minor name change request even remotely similar to the statutes discussed in *Collier*. The *Collier* decision contained an examination of "Ohio's non-parental-visitation statutes under the strict scrutiny standard." *Id.* Without any supportive authority, the majority extends the constitutional principles discussed in that specific statutory analysis to a probate court's proceedings in a request for a minor's name change. The majority, in my opinion, blazes unchartered territory in holding "special weight" must be given to parental preferences when ruling on a request to change a young person's name. Such mandates are better left to the legislature or the Ohio Supreme Court. While a parent's concerns and preferences are always factors to be considered, no statute or authority directs the amount of weight any one factor is to be given.[6]

**{¶ 44}** Despite the majority's criticism of the probate court, it is easily observed from the record that the probate court appropriately undertook its responsibilities to analyze the circumstances by engaging in dialogue with the applicant and her family. Counsel's brief, quite incorrectly, suggests the probate court was attempting to supplant what it personally thought was "wise." The probate court, in fact, was developing the record in an effort to determine what was "reasonable and proper cause" and in the young person's best interest. Contrary to the majority's criticism, and counsel's arguments, the probate court's development of the record only benefitted the applicant in demonstrating a name change was appropriate to take place.

**{¶ 45}** Significant information is derived from the probate court's discussion with Mother, Father, and H.C.W. However, while the probate court correctly engaged in dialogue and developed the record, the probate court simply erred in its conclusion. Additionally,

---

6. Since name change proceedings do not require any "fact finding," it is impossible to know what factors were considered or how much weight was attributed to various factors considered.

contrary to the majority's opinion, it would be better to draw our conclusions using Ohio statutory and common law, rather than engaging in a legal analysis which was never raised by appellant.

{¶ 46} The issue is a simple one: what does the record indicate when analyzing whether the name change was reasonable and proper and in the best interest of the young person? The answer lies directly within the facts contained in the record as they relate to the factors set forth by the Ohio Supreme Court in *Bobo v. Jewell*, 38 Ohio St.3d 330 (1988), paragraph two of the syllabus, and later in *In re Willhite*, 85 Ohio St.3d 28 (1999). As the Ohio Supreme Court has stated, "although *Bobo* and *Willhite* arose in differing context, they set out general guidelines that apply in *any* name change determination involving a minor child." (Emphasis added.) *D.W. v. T.L.,* 134 Ohio St.3d 515, 2012-Ohio-5743, ¶ 17. The factors set forth by the Ohio Supreme Court that apply to any name change, including the case sub judice, include:

> 1) the effect of the change on the preservation and development of the child's relationship with each parent,
>
> 2) the identification of the child as part of a family unit,
>
> 3) the length of time that the child has been using a surname,
>
> 4) the preference of the child if the child is of sufficient maturity to express a meaningful preference,
>
> 5) whether the child's surname is different from the surname of the child's residential parent,
>
> 6) the embarrassment, discomfort, or inconvenience that may result when a child bears a surname different from the residential parent's,
>
> 7) parental failure to maintain contact with and support of the child, and
>
> 8) any other factor relevant to the child's best interest.

*Bobo* at paragraph two of the syllabus.

{¶ 47} Whether the name change request is for a forename or surname is a difference of no consequence. Furthermore, common sense reveals it will always be the case that not all factors are specifically relevant to all circumstances. The majority opinion marginalizes the application of *Bobo/Willhite* because the circumstances of those cases were different, yet the Ohio Supreme Court was aware that different circumstances will arise and thus made the factors comprehensive and inclusive. Ohio courts would never prohibit a relevant factor from being considered when determining the best interest of a young person.

{¶ 48} Based on an examination of the record, there were no negative factors portrayed. With the circumstances comprehensively discussed, when applying the *Bobo/Wilhite* factors, there is no choice than to find that the name change was reasonable and proper. The record indicates that H.C.W. had been using the male name for over a year before the hearing occurred. Specifically, H.C.W. met with a school counselor to address using the male name and instituted the name change among teachers and H.C.W.'s peers. School administration has also honored H.C.W.'s request to use the male name. Thus, H.C.W. had already shown a commitment to, and comfort with, the name for over a year before petitioning the court to legalize the name change. H.C.W.'s public presentation for over a year as a gender different than the one from birth is no small step.

{¶ 49} H.C.W.'s parents spoke of H.C.W.'s history of, and commitment to, living life as a male and taking the necessary steps to make the transition a mentally and physically healthy one. H.C.W. participated in over 20 hours of therapy with the adolescent therapist who specialized in gender dysphoria and saw a physician multiple times to discuss the physical transformation. Only after this extensive counseling did the therapist give approval for H.C.W.to begin the physical transformation to parallel H.C.W.'s choice to live as a male. Beyond consulting experts, a few signs of H.C.W.'s commitment are short hair, wearing male clothing, and self-identification using a male name.

{¶ 50} The record also indicates that the steps H.C.W., Mother, and Father have taken regarding the transitioning process have been by design and methodical. Mother and Father specifically initiated medical and psychological involvement to identify and diagnose H.C.W.'s gender dysphoria, and then continued with therapy for over a year to ensure that H.C.W.'s identification as male was permanent.

{¶ 51} Only then did the family begin preparation for H.C.W.'s physical transformation from female to male. H.C.W. has already received medical consent to begin the physical transformation, and Mother and Father have investigated and confirmed the existence of insurance coverage for necessary procedures. Medical doctors have drawn H.C.W.'s blood to determine baseline hormone levels, and the family has already scheduled the first hormone therapy treatment. The family is resolute in their commitment.

{¶ 52} Mother expressed to the court that the name change and transitioning was not "something that we are treating lightly. There's been a lot of discussion about it." After the lengthy process, and with comprehension of the complexities involved, H.C.W.'s parents expressed their full support for H.C.W.'s name change. The record makes it obvious H.C.W.'s parents have a medical understanding for the direction in which their child is proceeding.

{¶ 53} H.C.W. has shown maturity regarding gender dysphoria and gender transitioning and is knowledgeable about the processes associated with the name change and the reason for such. H.C.W.'s therapist described H.C.W. as "stable," "very engaged," and "compliant with therapy."[7] H.C.W. showed awareness of the consequences of hormonal therapy and knowledge that some aspects of hormonal therapy may be "permanent in nature and are irreversible."

---

7. The letter is not file stamped, but is included in the case file. During the hearing, Father specifically references the letter multiple times and asks the probate court if it would "like a copy of the letter." The probate

{¶ 54} Moreover, the name change will alleviate the embarrassment and discomfort H.C.W. suffers by not being identified with the male name. H.C.W. expressly confirmed that when people use the birth name, it "drudg[es]" up anxiety, and the probate court, itself, recognized that granting the name change "will help resolve some of the feelings of distress that accompanies" use of H.C.W.'s birth name.

{¶ 55} For example, H.C.W. explained to the court that the name change would allow the school to permanently change names so that substitute teachers would know what name to use rather than using the birth name otherwise not publicly used. H.C.W. also addressed the importance of having legal documents, prescriptions, and other identification reflect the male name. Father also reiterated the importance of H.C.W.'s male name being used on H.C.W's future driver's license, passport, college application, in the case of emergency situations, and in regard to insurance information.

{¶ 56} Mother and Father have supported H.C.W. in every aspect of transitioning gender and in the name-change process. Mother petitioned the court to legally change the name and Father signed the petition in support. The record indicates that both parents gave great consideration to the name-

{¶ 57} change process and, as Mother expressly told the probate court, she and Father are "convinced that it's in [H.C.W.'s] best interest to change his name."

{¶ 58} The majority generates a holding of "special weight" to impose upon the probate court on remand when in reality we need only look to the record to ascertain the judgment that must be entered. However, we should refrain from mandating the amount of weight any one factor must always receive in every case. When the factual information from the record is applied to the factors to be considered pursuant to *Bobo/Willhite*, denying the requested name change is eliminated as a reasonable option. Therefore, remanding the

court replied, "please." Thus, this exchange indicates that the trial court viewed the letter during the hearing.

matter only causes the court and parties further inconvenience, which should be avoided.

{¶ 59} I commend the probate court for taking the time to appropriately develop the record; yet, that same record reveals the probate court simply erred in drawing its conclusion. For these reasons, which are drawn exclusively from the record, I would enter judgment as a matter of law in favor of the name change according to App.R. 12(B).